Hans P. KRAUS and Hanni Z. Kraus et al., Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

Nos. 182–187, Dockets 73–1814–73–1819.

United States Court of Appeals, Second Circuit.

Argued Nov. 21, 1973.

Decided Jan. 3, 1974.

---

William A. Friedlander, Atty., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Myer Rothwacks, Stephen Schwarz, Attys. Tax Div., Dept. of Justice, Washington, D. C.), for appellee.

Martin A. Roeder, New York City (Guggenheimer & Untermyer, New York City, Harold Manheim, Raymond W. Mitchell, Edward First, New York City, on the brief), for appellants.

Before LUMBARD, MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

These are consolidated appeals from decisions of the United States Tax Court which involve deficiencies in the taxpayers' federal income tax for the year 1965 in the aggregate amount of $274,886.78. The findings of fact of the Tax Court and the opinion of Hon. Samuel B. Sterrett were entered on February 26, 1973 and are reported at 59 T.C. 681. The taxpayers filed notices of appeal on May 18, 1973 and the parties thereafter filed a stipulation of venue providing for review of all the decisions by this court.

On July 30, 1965 each of the taxpayers sold part of the common shares which he held in Kraus Reprint, Ltd. (KRL), a Liechtenstein corporation, realizing a substantial gain. Section 1248(a) of the Internal Revenue Code provides that a gain realized by United States shareholders on the sale of foreign stock shall be treated as a dividend (rather than as a capital gain) "to the extent of the earnings and profits of the foreign corporation attributable . . . to such stock which were accumulated in taxable years of such foreign corporation beginning after December 31, 1962, and during the period or periods the stock sold . . . was held by such per-

son[s] while such foreign corporation was a controlled foreign corporation." The taxpayers reported the entire gain on the sale of their stock as a long-term capital gain. The Commissioner of Internal Revenue found, however, that KRL had been a "controlled foreign corporation," and therefore, determined that the proportion of the gain equal to all the earnings and profits accumulated by KRL and attributable to the stock during the relevant period should be treated as a dividend.

A "controlled foreign corporation" is defined in section 957(a) of the Internal Revenue Code as "any foreign corporation of which *more* than 50 percent of the total combined voting power of all classes of stock entitled to vote is owned . . . by United States shareholders on any day during the taxable year of such foreign corporation." (emphasis added). It is conceded that 50% of the voting stock of KRL was held by the common stockholders, all of whom were United States shareholders. The other 50% was owned by preferred stockholders, none of whom were United States shareholders. The Tax Court held that the voting preferred stock was merely a device utilized to give the appearance of compliance with section 957(a) and that KRL was in fact a controlled foreign corporation. Affirmed.

I

The taxpayers here are Hans B. Kraus, his wife, Hanni, and their five children, who acquired all of the outstanding stock of Scientific Periodicals Enterprises, Ltd., a Liechtenstein corporation engaged in the business of reprinting and selling foreign out-of-print materials. The acquisition occurred on or about October 31, 1962 and on November 9, 1962, the corporate name was changed to Kraus Reprint, Ltd. The original capital consisted of 100,000 Swiss francs (SFr.) divided into 100 common shares, each duly issued with a par value of SFr. 1,000 per share. On December 12, 1962, KRL held an extraordinary general meeting for the primary purpose of altering its capitalization.

At the meeting, KRL's authorized capital was increased from SFr. 100,000 to SFr. 200,000, represented by 1,000 common shares in bearer form, each with a par value of SFr. 100, and 100 registered 8% cumulative preferred shares, each with a par value of SFr. 1000. The articles of incorporation were amended to provide that 10 common shares were entitled to one vote, and each preferred share was entitled to one vote. As a result, the taxpayers here, who were the common shareholders, and the new preferred shareholders each held 50% of the voting stock.

At the same meeting, the articles of incorporation were amended as follows:

1) Preferred stock could be transferred "only with the approval of the Board of Directors" and approval could be denied "on the basis of important reasons." If preferred stock was acquired pursuant to an act of law (e. g., inheritance, matrimonial regime, bankruptcy), the board could deny registration if the corporation or its shareholders declared that they would acquire the shares at the real value at the time the application for registration was made.

2) The preferred shares could be repaid or redeemed by the corporation after not less than three months' notice at par value, plus any past due and current dividends to the day of redemption.

On or about December 12, 1962, the newly created preferred shares were acquired by subscription from KRL at their par value by the following persons in the amounts shown:

| Person | No. of Shares | Amount |
|---|---|---|
| Emka Foundation | 45 | SFr. 45,000 |
| Julia Zeller de Mozer | 10 | 10,000 |
| Kurt Winter | 18 | 18,000 |
| E. V. D. Wight, Jr. | 9 | 9,000 |
| Herbert Kingsbury Wight | 9 | 9,000 |
| Thiele & Co., A.G. | 3 | 3,000 |
| Braunschweig & Cie | 3 | 3,000 |
| Jacques Bloch | 3 | 3,000 |

During the three fiscal years following the acquisition of KRL by the Kraus

family, the corporation's net worth increased from $250,169.34 as of November 30, 1962 to $2,788,538.18 as of November 30, 1965. The annual profits increased from $226,967.49 for fiscal 1962 to $1,217,014.20 for fiscal 1965.

On April 1, 1965, all of the preferred shareholders simultaneously sold all of their shares to Bank und Finanz Institut, A.G. (Bank und Finanz), with the approval of the KRL board, at their par value. On July 2, 1965, the articles of incorporation of KRL were amended to authorize a split of the 100 preferred shares into 1,000 preferred shares, each with a par value of SFr. 100. On July 16, 1965, the taxpayers agreed to sell 51% of their KRL common stock to a Canadian corporation, Thomson International Corporation, Ltd. (Thomson). The agreement further provided that Hans and Hanni Kraus would cause the owner of the KRL preferred stock (Bank und Finanz) to sell 51% of that stock to Thomson concurrently with the closing, and that the Krauses would buy the remaining 49% of preferred stock at the same price and terms as Thomson. On July 30, 1965, pursuant to the agreement, the taxpayers sold 51% of their common stock to Thomson, realizing the gain which gives rise to the present controversy. At the same time, Bank und Finanz sold 51% of the KRL preferred stock to Thomson and the remaining 49% to the Krauses.

There is no dispute here with respect to the amount of accumulated earnings and profits of KRL during the relevant period or the computation of the taxes which may be due and owing. The basic question before this court is whether the Tax Court correctly held that KRL was a "controlled foreign corporation" within the meaning of section 957(a) of the Internal Revenue Code during the period of December 31, 1962 through July 30, 1965, so that the gain realized upon the sale of its common stock by the taxpayers resulted in the receipt of dividend income as provided by section 1248(a) of the Code.

II

The main contention of the appellant taxpayers is that they did not own more than 50% of the combined voting power of all the classes entitled to vote. It is urged that, under the clear and unambiguous language of section 957(a), we must simply apply a mechanical test of stock ownership irrespective of actual voting power. The precise question has recently been determined adversely to the contentions of the taxpayers by a panel of this court in *Garlock, Inc. v. Commissioner,* 489 F.2d 197 (1973). This court in that case interpreted section 957(a) consistently with Treasury Regulation section 1.957–1(b)(2)—"that it is 'real' voting power and not the mere mechanical number of votes with which Congress was concerned." 489 F.2d at 201–202. The Regulation provides in pertinent part:

> Any arrangement to shift formal voting power away from United States shareholders of a foreign corporation will not be given effect if in reality voting power is retained. The mere ownership of stock entitled to vote does not by itself mean that the shareholder owning such stock has the voting power of such stock for purposes of section 957.

The facts in this case compel the conclusion reached by the Tax Court:

> [T]he petitioners never intended to part with any voting control in KRL, nor did the preferred shareholders intend to use the voting power nominally carried by their stock.
> 59 T.C. at 696.

In determining whether "real" voting power was surrendered, we look to the actualities stressed in *Garlock* and in Treasury Regulation section 1.957–1(b)(2).

The creation of the new class of preferred stock took place on December 12, 1962 just before the new regulations were to become effective for taxable years beginning after December 31,

1962.[1] While we agree that it is entirely legal to arrange one's affairs so as to minimize taxes, we must here look behind the facade to determine whether a real transfer of voting power to the preferred stockholders took place, or whether the purpose of the arrangement was simply to avoid the appearance of KRL as a "controlled foreign corporation." At the very outset, it defies credulity that the taxpayers who owned 100% of KRL, a corporation which at the end of the fiscal year 1962 had a net worth in excess of $250,000, and was then making annual profits in excess of $225,000, would surrender 50% of the control of their corporation to new shareholders who were making a capital contribution of SFr. 100,000, less than $25,000.[2]

The new preferred stockholders were carefully selected, moreover, so that no rocking of the corporate boat could be anticipated. The Emka Foundation, which purchased 45 shares, was represented legally by one Hans Kolb, who also represented other companies owned by Hans Kraus. The official administrator (Stiftungsrat) of Emka was E. V.D. Wight, who was also the chief executive officer of KRL from its formation until July, 1965. Wight's two infant sons (E.V.D. Wight, Jr. and Hubert Kingsbury Wight) each purchased nine shares and under Liechtenstein law, their father had the right to represent them at stockholder meetings and to vote their stock. The opinion of the Tax Court establishes in considerable detail that all the other new preferred stockholders were either relatives, close personal friends or business associates of the Kraus family. 59 T.C. at 685–686.

Even with a presumably acquiescent and amenable preferred shareholder class, further restrictive protections were provided. Although the common stock was in bearer form and freely transferable, the preferred stock was registered and transfer was permitted only with the approval of the board of directors. Transfer could be prohibited for "important reasons" and there was no definition or suggestion as to what such reasons might be. Even shares passing by operation of law could be denied registration if the corporation itself desired to purchase the shares. More significantly, the board of directors[3] had the right to redeem the preferred shares at par value, plus past due and current dividends, on three months' notice. (This is an indicium of retention of control which was not present in *Garlock*, even though the corporation there initially considered a similar callability provision (489 F.2d at 199)). There was no arrangement for the breaking of a deadlock in voting, and in view of the call provisions, the redemption of any dissident stockholder's shares at par value provided an obvious solution to any problem.

1. Prior to 1962 most foreign corporations, even though controlled by American stockholders, were exempt from United States taxes on their foreign-source income. United States shareholders were taxed on their share of the earnings only when received by them through distribution or as proceeds from transfer of their stock. Earnings could be accumulated and then repatriated by liquidation or sale at preferential capital gains tax rates. To remedy these abuses, President John F. Kennedy recommended in his 1961 Tax Message to Congress that such tax haven devices be eliminated. See H.R.Doc.No.140, 87th Cong., 1st Sess., in 1961 U.S.Code Cong. & Admin.News, pp. 1129, 1133–1134. As a result, a series of provisions was made applicable to United States shareholders of "controlled foreign corporations," devised not only to tax current income but also, under section 1248 of the Internal Revenue Code, to govern sale or exchanges of stock in such corporations.

2. The average rate of exchange during the relevant period herein was SFr. 4.31 to 1 U.S. dollar.

3. The board of directors of KRL was the incumbent board perviously elected solely by the taxpayers. The only changes were on January 9, 1963, when the taxpayer Mary Ann Mitchell (formerly Kraus) was elected, and on August 19, 1963, when Hans P. Kraus was elected, as well as Prince Heinrich of Liechtenstein. That the Kraus family dominated the board does not appear to be questioned.

While it is true that the preferred stockholders were represented at all of the meetings held during the relevant period (on three occasions the representation was 100%), it was also the fact that at all five meetings the common stock was represented 100%. Moreover, at only one meeting was a preferred stockholder present in person to express his views. The record is barren of any indication of dissent or disapproval of any preferred stockholder in person or by proxy at any meeting. It is urged that KRL was a successful, well-managed corporation, and that preferred stockholders with an assured 8% return on their investment could hardly be expected to be unruly. Whatever force this argument possesses evanesces when we examine the orchestrated demise of the preferred stockholders, which was marked with the same complacency and obeisance which characterized their brief tenure as shareholders in KRL.

On April 1, 1965, the preferred stockholders simultaneously sold all of their stock in this successful corporation to Bank und Finanz at par value. In the taxpayers' agreement of July 16, 1965 to sell their common stock to Thomson, Section 5 of the contract provided that Mr. and Mrs. Kraus would cause the owner of all the outstanding preferred stock of KRL (Bank und Finanz) "to sell 51% of such stock to Thomson . . . at an aggregate price not exceeding 52,020 Swiss francs plus an amount equal to the dividends accrued and unpaid thereon at the rate of 8% per annum from November 30, 1964 to the Closing Date." The agreement further provided that Mr. & Mrs. Kraus would "buy the remaining 49% of such preferred stock from [Bank und Finanz] at the same time and at the same price and terms as Thomson." Hans Kraus, moreover, promised to reimburse Bank und Finanz for all stock transfer taxes levied in connection with the sale of the preferred stock.

While the record does not reveal in any detail the corporate structure or control of Bank und Finanz, its function as a device manipulated by Hans Kraus is clear. It is interesting to note that its KRL preferred stock was voted at the July 2, 1965 meeting by two American lawyers who represented Hans Kraus. The wholesale elimination of the initial preferred stockholders, the substitution of Bank und Finanz in April, 1965; and the sale of its KRL stock in turn to Thomson and the Kraus family in July, 1965, inevitably lead to the conclusion that the taxpayers never surrendered any real voting power to the preferred stockholders. While no single factor set forth here might in itself be sufficient to establish that KRL was a "controlled foreign corporation" within the meaning of Section 957(a) of the Internal Revenue Code, the sum total establishes beyond any doubt that the conclusion of the Tax Court was sound.

Affirmed.