ESTATE OF EDWIN C. WEISKOPF, DECEASED, ANNE K. WEISKOPF AND SOLOMON LITT, EXECUTORS, AND ANNE K. WEISKOPF, SURVIVING WIFE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

EDWIN C. WHITEHEAD AND JOSEPHINE WHITEHEAD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1920–69, 1934–69.      Filed April 17, 1975.

*James B. Lewis,* for the petitioners in docket No. 1920–69.
*Laurence Goldfein, Mark H. Johnson,* and *Richard A. Levine,* for the petitioners in docket No. 1934–69.
*Agatha L. Vorsanger* and *Barry D. Gordon,* for the respondent.

WILES, *Judge:* Respondent determined deficiencies in petitioners' income taxes for taxable year ending December 31, 1966, in amounts as follows:

| Petitioner | Amount of deficiency |
|---|---|
| Estate of Edwin C. Weiskopf | $481,465.57 |
| Edwin C. and Josephine Whitehead | 454,329.78 |

Several issues have been settled by the parties. The remaining issues are: (1) Whether, for purposes of applying section 1248,[1] a foreign corporation is a "controlled foreign corporation" as defined in section 957(a); and (2) if determined to be a controlled foreign corporation, whether respondent's computations under section 1248 are correct.

#### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners in docket No. 1920-69 are Anne K. Weiskopf and Solomon Litt, the duly qualified and acting executors of the Estate of Edwin C. Weiskopf (hereinafter referred to as Weiskopf), who died a resident of New York, N.Y., on February 7, 1968, and Anne K. Weiskopf, Weiskopf's surviving spouse. The legal residence of all such petitioners at the time of the filing of the petition was New York, N.Y. Weiskopf filed a joint Federal income tax return for the calendar year 1966 with the District Director of Internal Revenue, Manhattan, New York.

Petitioners in docket No. 1934-69 are Edwin C. Whitehead (hereinafter referred to as Whitehead) and Josephine Whitehead, husband and wife, who were legal residents of Rye, N.Y., when the petition was filed. They filed a joint Federal income tax return for the calendar year 1966 with the District Director of Internal Revenue, Manhattan, New York. Whitehead was the son of Weiskopf.

Technicon Instruments Corp. (hereinafter referred to as Technicon) was incorporated in the State of New York and was wholly owned by Whitehead and Weiskopf. During the years 1963 through 1966, Whitehead was the president of Technicon and Weiskopf was chairman of the board of directors. Technicon's primary business was the manufacture and sale of

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue, unless otherwise indicated.

scientific instruments, the most important of which was the "AutoAnalyzer" which Technicon began manufacturing and distributing in 1957. Technicon acquired the patent rights to the AutoAnalyzer in 1957 and owned all such rights through all periods relevant to this case. Prior to 1963, Technicon manufactured AutoAnalyzers that were sold in the world market, except the United Kingdom and some Commonwealth countries.

Technicon Instruments Co., Ltd. (hereinafter referred to as Limited), was a wholly owned subsidiary of Technicon and was organized under the laws of the United Kingdom in the late 1950's. Limited's business initially consisted of assembling AutoAnalyzers from parts made in the United States by Technicon for sale in the United Kingdom. Subsequently it started its own manufacturing and selling operations in the United Kingdom. In or about 1963, Technicon expanded the manufacturing capacity of Limited so as to enable it to supply AutoAnalyzers to the world market outside of the United States. During the period 1963 through 1966 the directors of Limited were Edwin C. Weiskopf, Edwin C. Whitehead, William Robert Carr, and Leslie James Evans. Leslie James Evans (hereinafter referred to as Evans) was the operating head of Limited.

Romney Finance Co., Ltd. (hereinafter referred to as Romney), was a corporation organized under the laws of the United Kingdom on November 28, 1962. At all times relevant to this proceeding, all of the outstanding shares of Romney were owned by Unex Investment Trust Ltd. (hereinafter referred to as Unex), a corporation organized under the laws of the United Kingdom. Unex was a British "investment holding company" engaged in the business of investing in the shares of publicly traded securities. It was a publicly held company. Unex formed Romney to undertake "dealing" operations which Unex itself could not undertake, which included investments in private companies. Prior to 1963, Romney invested primarily in public companies and undertook some underwriting activities.

Bernard Franklin (hereinafter referred to as Franklin) was on the board of directors of Unex from 1963 through 1968. Franklin was also on the board of directors of Romney from the time of its incorporation. Franklin was a chartered accountant and senior partner in the firm of Bagshaw & Co., London, England. He was never an officer, employee, or director of Technicon, Limited, or any of their subsidiaries.

William Robert Carr (hereinafter referred to as Carr), one of the directors of Limited, was a solicitor with the firm E. F. Turner & Sons, in London, England. Carr and his firm represented Technicon and Limited in their activities in the United Kingdom from the time of their incorporation. The Turner firm also represented Unex, when it had occasions to employ solicitors. Carr approached the board of directors of Limited with the idea that an Overseas Trade Corp. (hereinafter referred to as OTC) be created under the laws of the United Kingdom in order to gain exemption from United Kingdom income and profits tax on all trading income from outside of the United Kingdom. The board of directors directed Carr to investigate the concept and work out a "scheme" to implement it.

After the plans for establishing an OTC were formulated, Carr became concerned that a company wholly owned by Whitehead and Weiskopf would be open to a "surtax direction" which Carr described as a tax similar to an accumulated earnings tax under United States tax provisions which, in his opinion, would have partially negated the tax benefits of an OTC. He therefore suggested to Whitehead and Weiskopf that they have 11 equal shareholders in the OTC, which he testified was "greeted with horror." Carr then suggested that 51 percent of the vote of the proposed OTC be given to a publicly owned company in England. This suggestion was also unacceptable to Whitehead and Weiskopf. An arrangement whereby 50 percent "of the votes" would go to a public British company was accepted by Weiskopf and Whitehead.

Carr then approached several people with the proposition for investment in a proposed OTC. One of the people approached was Franklin, as a representative of Romney. An initial dividend rate of approximately 8 or 9 percent was offered to Romney by Carr for an investment in the proposed OTC; however, a final dividend rate of 12½ percent was agreed upon by Franklin and Carr. The dividend to be paid on Romney's investment in the proposed OTC was substantially higher than the rate of return on Government stocks and approximately 5 percent higher than the then-prevailing bank interest rates.

On November 22, 1963, Intapco, Inc. (hereinafter referred to as Intapco), was incorporated under the laws of the State of New York. Intapco was formed for the holding of stock in Ininco, Ltd. (hereinafter referred to as Ininco), the proposed OTC. Intapco

earned no income and did not file Federal corporate income tax returns, although it did file New York State franchise tax returns. Intapco had two classes of stock authorized consisting of 100 shares of common and 500 shares of preferred stock. Upon incorporation Whitehead subscribed to 70 shares of common stock, for which he paid $7,000. Weiskopf subscribed to 490 shares of preferred stock, for which he paid $49,000. Par value of both preferred and common stock was $100 per share.

On November 24, 1963, Intapco and Weiskopf entered into an agreement which granted Weiskopf the option, only during his lifetime, to convert up to 70 shares of his preferred stock into common stock, share for share. The conditions which entitled Weiskopf to the exercise of the option were essentially as follows:

(a) If Intapco terminated, in any manner, its entire stock interest in any other company affiliated with Technicon, or any of its domestic or foreign affiliates. The word affiliate was to be given the broadest possible meaning so as to include any company which handled any "Technicon" products, whether or not such companies were connected through stock ownership;

(b) If neither Intapco nor any subsidiary had done business with Technicon or any affiliate during the 4 months preceding the exercise of the option;

(c) If Intapco authorized any distribution in respect of its common stock of any stock interest held by it in any affiliate of Technicon; or

(d) If the holders of not less than 50% of the common stock of Intapco agreed to the sale or other disposition of such stock.

Whitehead also signed the agreement, which provided as follows:

Edwin C. Whitehead as the owner of all the common stock of this Corporation, by his signature at the foot hereof, hereby acknowledges his consent to and approval of the authorization and delivery of the within option, and agrees, for himself, his successors and assigns, to take all necessary action, as the holder of the common stock, to implement the terms of this option and further agrees to the taking of such necessary steps by the board of directors and officers of the company, including amendment of the certificate of incorporation to authorize the conversion, if that may be deemed necessary in the opinion of counsel for this Corporation, and to increase the authorized shares of common stock to such number as would be sufficient to satisfy the conversion privileges under this option.

On November 28, 1963, Ininco was incorporated under the laws of the United Kingdom. It qualified as an OTC under United Kingdom law and as such was exempt from United Kingdom income and profit tax on its trading income from outside the United Kingdom.

The share capital of Ininco was divided into three classes of stock as follows: (1) 250 preferred ordinary shares; (2) 250

deferred ordinary shares; and (3) 175 second preferred ordinary shares. From the inception of Ininco and through February 24, 1966, Romney owned all of the 250 preferred ordinary shares of Ininco, for which it paid 25,000 pounds.[2] Intapco owned all of the 250 deferred ordinary shares and all of the 175 second preferred ordinary shares, for which it paid 2,500 pounds and 17,500 pounds, respectively. As provided in the articles of association of Ininco, the preferred ordinary shares and the deferred ordinary shares were entitled to one vote per share and the majority of each such class of stock was entitled to appoint not more than two directors of Ininco. The second preferred ordinary shares had no voting rights. During all periods relevant to this proceeding the board of directors of Ininco consisted of four directors. During the period of November 29, 1963, to March 14, 1966, the directors of Ininco were Edwin C. Whitehead, Edwin C. Weiskopf, Bernard Franklin, and Maurice Goldwater. Each director had the power to appoint another director or another person to act as an alternative director during his absence provided such person was approved by resolution of the board.

The articles of association for Ininco also provided that the preferred ordinary shares were to receive a cumulative dividend of 12½ percent per annum and that the second preferred ordinary shares were entitled to a cumulative dividend of 4 percent per annum. The balance of the profits were payable to the second preferred ordinary shares and the deferred ordinary shares, provided that the amounts payable to the second preferred ordinary shares did not exceed 8½ percent annually. In the event of termination of the company the preferred ordinary shareholders were entitled to a preference limited to a return of their investment plus any arrears or deficiency of the fixed cumulative dividend. Thereafter, the holders of the second preferred ordinary shares were entitled to a preference limited to a return of their investment plus any arrears or deficiency of the fixed cumulative dividend. The balance was to be distributed to the holders of the second preferred ordinary shares and deferred ordinary shares in proportion to their investments, except that distribution to holders of the second preferred ordinary shares was limited to 12 percent per annum of their investment from the date of issue to the date of payment.

---

[2] The parties have stipulated that the exchange rate during all years relevant to these proceedings was 2.786 dollars to 1 pound.

The articles of association for Ininco further provided that any share may be transferred to any member of the company provided it is first offered to the other shareholders. The articles provided that a member desiring to sell his shares must give notice in writing to the company thereby constituting it as an agent for the purposes of the transfer. The directors were then required to notify the other shareholders of the selling shareholders desire to sell. Fair market value was to be fixed by the auditors of the company for purposes of transfer. The actual transfer was subject to the following provisions:

31. The instrument of transfer of a share shall be executed by or on behalf of both the transferor and the transferee, and the transferor shall be deemed to remain the holder of the share until the name of the transferee is entered in the register in respect thereof. All instruments of transfer, when registered, shall be retained by the Company.

32. The Board may, in its absolute discretion and without assigning any reason therefor, decline to register any transfer of any share whether or not it is a fully paid share.

On November 29, 1963, Intapco, Romney, and Ininco entered into an agreement entitled "Shareholders Agreement." Article 3 of that agreement provided, in effect, that if Intapco desired to dispose of its Ininco shares it must first offer the shares for sale to Romney and vice versa. If the shares offered were not purchased by the other shareholder the offering shareholder was free to sell the shares to others or to call for liquidation of Ininco. Under the shareholders' agreement the price to be paid to the selling shareholder for the offered shares was the amount which the shares would receive on liquidation of the corporation, taking into account the corporation's tax liabilities. Under the articles of association of Ininco, upon liquidation of that corporation, the owners of the preferred ordinary shares and the second preferred ordinary shares were entitled to receive the par value of those shares plus unpaid dividends, if any. The balance, if any, was distributable to the deferred ordinary shares.

The agreement also provided that, in view of the even division of control of Ininco between the holders of the preferred ordinary and the deferred ordinary shares, the parties in their capacity as shareholders and directors would endeavor to prevent a deadlock that would impede the normal conduct of the business of the company and would exercise all due diligence to resolve any such impasses expeditiously. The agreement also provided as follows:

10.(a) None of the parties hereto shall, after a dissolution of the O.T.C. or a sale of its shares therein, have any rights solely by reason of having been a shareholder of the O.T.C. with respect to the name of the Company, or its customers' or other goodwill, if any, nor to continued handling of products of manufacturers with whom the O.T.C. may do business from time to time; (b) It is the intention of the parties that:—(i) no rights shall accrue to any of them in the O.T.C. or its successors by reason of such party being a shareholder, in the O.T.C. to interfere in any way with the freedom of any of the other parties who are shareholders of the O.T.C. to engage in any business activity which may be competitive with the O.T.C. during the life of this agreement or thereafter, nor to recover any damages by reason of such business activity, and (iii) they shall not obtain for themselves the right to any commercial opportunities, or the benefits therefrom which could be regarded as belonging to the O.T.C. its shareholders and beneficial owners in the absence of this Agreement;

and this Agreement shall be construed liberally to give effect to this intention.[3]

The agreement further provided that any question arising as to interpretation of the agreement or as to any rights, duties, or liabilities of any parties was to be settled by arbitration.

Ininco became engaged in the business of selling AutoAnalyzers, manufactured by Limited, to the world market outside of the United States and the United Kingdom. Limited continued to sell AutoAnalyzers it manufactured in the United Kingdom market. Ininco would purchase AutoAnalyzers from Limited and pay for the products. It in turn would sell the AutoAnalyzers to agents and distributors overseas, some of which were affiliated in some manner with Technicon. It went through an evolutionary period at this time from the use of independent agents and distributors to establishing offices in foreign countries. One of the purposes of establishing Ininco was to take advantage of the United Kingdom tax benefits and thereby build up capital to finance what Whitehead testified was to be a rapidly expanding export business of Technicon. Ininco would provide credit terms for offices which were overseas and affiliated with Technicon for which no interest was apparently paid by the latter. The credit given to the Technicon affiliated offices overseas in effect "gave them a chance to build their business." There was no written agreement between Ininco and Limited relating to the sale of AutoAnalyzers for any extended period of time beyond the fulfillment of each order.

---

[3]This agreement provision originally contained a subpar. (ii) which was eliminated by agreement of the parties.

There was no provision in the articles of association of Ininco to break any deadlock vote which might arise. Franklin and Goldwater were appointed to the board of directors of Ininco by Romney. Weiskopf and Whitehead were appointed to the board of directors of Ininco by Intapco. Romney required that all checks in excess of 500 pounds be countersigned by Carr. A board of directors meeting of Ininco held on November 29, 1963, approved this procedure. Evans, the managing director of Limited, was also the secretary of Ininco. He was also, at least in the eyes of Whitehead, the managing director who ran Ininco for all intents and purposes. The board of directors of Ininco granted powers of attorney as required for conduct of the company's business. The managing director in a British corporation is the equivalent of a president of an American corporation.

The special treatment accorded by the United Kingdom to an OTC was abolished by legislation enacted in 1965 and effective as of April 6, 1966. Carr advised Whitehead and Weiskopf of this new legislation and that as a result Ininco would no longer be exempt from income and profit tax on its current income. Upon such repeal Ininco no longer served the purpose for which originally intended and the decision was made by Weiskopf and Whitehead to terminate its existence. After it was decided to "get rid" of Ininco, Carr discussed the best method of doing so with the company's auditors (and others). It was determined that liquidation of Ininco by Intapco and Romney would result in the imposition of a 40-percent British tax on the liquidation distributions. United Kingdom law, however, permitted a non-resident to receive dividends in gross which would not be subject to such tax. Carr then approached Intapco with the suggestion that, because of favored tax provisions, Intapco stock should be sold to a Hong Kong company. Carr worked out arrangements for sale of Intapco stock (owned by Whitehead and Weiskopf) and Ininco stock (owned by Romney) to Hong Kong Holdings, Ltd. (hereinafter referred to as Hong Kong Holdings), a Hong Kong corporation. Hong Kong Holdings was a subsidiary of Wheelock Marden & Co., Ltd., a major Hong Kong corporation.

On December 6, 1965, Whitehead, Weiskopf, and Intapco entered into an agreement whereby Weiskopf exercised his option to convert 50 of his shares of preferred stock in Intapco into 50 shares of common stock upon execution of the sale agree-

ment to Hong Kong Holdings. The agreement stated that the conversion was to be accomplished as follows:

3. Because the presently authorized and unissued common stock of Intapco consists of only 30 shares, the parties have agreed upon the following plan of recapitalization, which has been approved by the directors of Intapco: (1) Whitehead shall immediately upon Weiskopf's exercise of such option, gratuitously surrender to Intapco 20 shares of common stock, and (2) Weiskopf shall convert 50 shares of his preferred stock into common stock, which Intapco shall forthwith issue to Weiskopf. It is the intention of the parties that immediately after the foregoing recapitalization, Weiskopf shall own 440 shares of preferred stock, and Weiskopf and Whitehead shall each own 50 shares of common stock, of Intapco.

4. To compensate Whitehead for economic loss resulting to him from the foregoing modification of the rights of the parties, Weiskopf shall pay to Whitehead $1,000 upon his receipt of the common stock of Intapco. This payment shall be treated by the parties as an adjustment of the sale proceeds from the forthcoming sale to Hong Kong Holdings Limited.

5. Weiskopf hereby waives his right to convert in excess of 50 shares of preferred stock pursuant to the aforesaid option.

On or about December 21, 1965, Carr approached Franklin to ask whether Romney was prepared to dispose of or deal its holdings in Ininco, because Intapco and Technicon "weren't going to use Ininco again." Franklin testified that at first he objected to sale of Romney's interest in Ininco, as the investment had been viewed as being of long-term duration. In a letter dated December 22, 1965, Franklin suggested that some premium element be added for Romney in order to get their approval to go along with the prospective sale of its stock in Ininco to a Hong Kong corporation.

On February 21, 1966, Hong Kong Holdings entered into an agreement with Whitehead and Weiskopf whereby each of the latter was to sell all of his stock in Intapco to the former. The terms of the purchase agreement required Hong Kong Holdings to pay the greater of (i) 735,000 pounds or (ii) the excess, less 15,000 pounds, of Ininco's assets over its liabilities, as certified as of the contract closing date by Touche, Ross, Bailey & Smart. The agreement required Whitehead and Weiskopf to "procure" that the preferred ordinary shareholders of Ininco (Romney) would sell their shares to Hong Kong Holdings at prices representing par value. Hong Kong Holdings had the option to rescind the purchase agreement if it could not prove to the satisfaction of the Commissioners of Inland Revenue (hereinafter referred to as Inland Revenue) "before the date on which the

liquidation of Ininco commences" that (i) it was not resident in the United Kingdom; (ii) it was beneficially entitled to any dividends declared in respect of the Ininco shares; (iii) the whole (or an appropriate part) of the undistributed income of Ininco was exempt trading income of Ininco for the purposes of Part IV of the Finance Act of 1957; and (iv) it was entitled to repayment of income tax deducted from any dividends declared by Ininco. The option to rescind expired on February 28, 1966. Hong Kong Holdings applied to Inland Revenue for authorization to have Ininco declare a dividend out of exempt trading income. In this declaration Hong Kong Holdings attested that it was the beneficial owner of and beneficially entitled to the dividends arising from the outstanding shares of Ininco. That application was approved on February 28, 1966, by Inland Revenue, which granted Hong Kong Holdings authority to pay, without a deduction of tax at the net United Kingdom rate, dividends out of exempt trading income.

Minutes of a meeting of the board of Ininco dated March 14, 1966, declared first that Goldwater had been replaced as director by A. J. Redpath (hereinafter referred to as Redpath). The minutes also listed payments of directors' salaries, directors' fees, and dividends that had been paid or were to be paid. The minutes approved and confirmed those payments already made and those to be made. With regard to the directors of Ininco, the minutes reflect the following payments (in pounds).

| | Year ended | | To be paid |
|---|---|---|---|
| Directors' salaries | 11/30/64 | 11/30/65 | |
| Weiskopf | 7,500 | 7,500 | 1875 |
| Whitehead | 7,500 | 7,500 | 1875 |
| Directors' fees | | | |
| Franklin | 250 | 250 | 71.4.8. |
| Goldwater | 250 | 250 | 71.4.8. |

The minutes also stated that all shareholders agreed that an additional dividend should be paid on the 250 preferred ordinary shares. Minutes of another meeting of the board, also dated March 14, 1966, reflected that the transfer of shares of Ininco by Intapco and Romney were recorded on the books of Ininco. The resignations of Franklin and Redpath were also accepted in these minutes. Minutes of a third meeting of the board dated March 14, 1966, accepted the resignations of Whitehead and Weiskopf and appointed four new directors. It was also resolved that a

dividend in the amount of the available exempt trading income (500,000 pounds) be declared for those beneficially entitled holders of the deferred ordinary shares.

Minutes of a meeting of the board of Ininco dated March 21, 1966, contained a resolution to declare an additional dividend of 305,000 pounds in favor of the holders of the deferred ordinary shares. It was also resolved to call a meeting for the purpose of proposing resolutions to place Ininco in voluntary liquidation. The minutes of an extraordinary general meeting dated March 23, 1966, stated that the following resolution was passed unanimously:

That the Company be wound up voluntarily by means of a Member's voluntary winding-up, and that William John Findlay of 3, London Wall Buildings, London, E.C.2. be and he is hereby appointed Liquidator for the purpose of such winding-up.

After Whitehead and Weiskopf were advised that Ininco would no longer gain the benefits of tax deferral offered by OTC provisions, they considered establishing manufacturing and selling operations outside of England. In June 1965, Griffin, Lynch & Co., a firm of chartered accountants, whose main office was in Dublin, Ireland, applied to the Republic of Ireland, on behalf of Technicon, for a grant which was offered by the Government of Ireland in August 1965. In 1966, AutoAnalyzers were manufactured and sold by Technicon (Ireland) Ltd., an Irish corporation wholly owned by Weiskopf and Technicon. The Irish tax laws applicable to Technicon (Ireland) Ltd. provide for a complete abatement until December 31, 1981, of corporate income and dividend withholding taxes on profits derived from its sales of products manufactured in the Republic of Ireland but sold elsewhere. Technicon (Ireland) took over the markets previously serviced by Ininco. Limited continued to manufacture and sell for the United Kingdom market, on a much smaller scale than when it supplied products to Ininco. After the transfer of the business to Hong Kong Holdings, Ininco did not solicit any new orders of AutoAnalyzers.

Weiskopf and Whitehead received the following amounts from Hong Kong Holdings pursuant to the agreement dated February 21, 1966:

| | | | |
|---|---|---|---|
| Mar. 1, 1966 _____ | $100,000.00 | Mar. 22, 1966 ____ | $150,000.00 |
| Mar. 15, 1966 ____ | 500,000.00 | Mar. 23, 1966 ____ | 249,620.13 |
| Mar. 16, 1966 ____ | 681,278.02 | May 4, 1966 _____ | 124,976.18 |
| Mar. 22, 1966 ____ | 450,000.00 | | |
| | | | 2,255,874.33 |

The total amount received by Whitehead for his stock in Intapco was $1,100,654.16. The total amount received by Weiskopf for his stock in Intapco was $1,155,220.17. Whitehead's basis for his investment in Intapco was $7,000. Weiskopf's basis for his investment in Intapco was $49,000. Whitehead and Weiskopf each reported gain on the sale of Intapco stock in 1966 as long-term capital gain.

The first taxable year of Intapco began on November 22, 1963, and ended on October 31, 1964, and its succeeding 2 taxable years ended on October 31, 1965, and February 24, 1966, respectively. The first taxable year of Ininco began on December 1, 1963, and ended on November 30, 1964, and its succeeding taxable year ended on November 30, 1965.

On February 21, 1966, Weiskopf tendered his resignation as a director of Intapco and Whitehead tendered his resignation as president, treasurer, and director of Intapco. At a board of directors meeting of Intapco held on February 21, 1966, those resignations were accepted and pursuant to the agreement with Hong Kong Holdings new directors were elected. At a board of directors meeting held on February 24, 1966, the board approved a motion to liquidate Intapco.

Authority to pay dividends from Ininco to Hong Kong Holdings without deduction of tax at net United Kingdom rates was given to Hong Kong Holdings in February 1966.

Except for the investment in Ininco there was no financial or business relationship between Unex or Romney, on the one hand, and Whitehead and Weiskopf.

At all times relevant to this proceeding, no United States person (as defined in section 957(d)) owned, directly or indirectly under the rules of section 958, 20 percent or more of any class of stock of Unex, and no shareholder of Intapco owned, directly or indirectly under such rules, any stock of Unex.

If it is determined that Ininco was a controlled foreign corporation within the meaning of section 957 and that Whitehead and Weiskopf are taxable as provided in section 1248 in respect of stock of Ininco, then for the purposes of section 1248:

(a) The earnings and profits of Ininco (computed in accordance with Treasury regulations issued under section 1248 of the Code) for its taxable years ended November 30, 1964, and November 30, 1965, were $801,836.43 and $941,143.17, respectively. The earnings and profits of Ininco (so computed) for its last taxable year were $500,078.92 unless the amounts of 500,000 pounds and 305,000 pounds were distributions out of earnings and profits within the meaning of section 1.1248–3(b)(3), Income Tax Regs.

(b) The income, war profits, and excess profits taxes paid by Ininco to countries other than the United States for its taxable years ended November 30, 1964, and November 30, 1965, were $16,138.74 and $27,306.64, respectively. The income, war profits, and excess profits taxes paid by Ininco to countries other than the United States for its last taxable year were $20,248.65.

(c) For the purposes of the computation under section 1248(b)(2), Weiskopf and his wife had (without regard to the Intapco transaction) a loss of $143,877.32 from the sale or exchange of capital assets, and Whitehead and his wife had (without regard to the Intapco transaction) a loss of $89,250.88 from the sale or exchange of capital assets.

In statutory notices of deficiencies dated January 29, 1969, respondent stated that the sale of Intapco stock represented the sale of an interest in a controlled foreign corporation which results in the receipt of ordinary dividend income. In amendments to answer dated July 7, 1972, respondent further alleged that the sale of Intapco stock was a sale in form only and that the transaction was in substance a liquidation.

OPINION

The main issue for determination is whether any part of the gain realized by Whitehead and Weiskopf upon the transfer of their interest in Intapco must be treated as a dividend under the provisions of section 1248.

Section 1248 [4] provides generally that, if a United States person sells stock in a foreign corporation and such person owns 10 percent or more of the total combined voting power of classes of stock entitled to vote when the corporation is a "controlled foreign corporation," the gain recognized should be included in gross income as a dividend to the extent of the earnings and profits of the foreign corporation. Section 1248(e) [5] provides that if a domestic corporation was formed or availed of principally for the holding of stock of a foreign corporation, the sale of the stock of the domestic corporation should be treated as a sale of the stock of the foreign corporation.

Section 957(a) [6] defines the term "controlled foreign corporation" as any foreign corporation of which more than 50 percent of the total combined voting power of all classes of stock entitled to vote is owned by United States shareholders on any day during the taxable year of such foreign corporation.

---

[4] SEC. 1248. GAIN FROM CERTAIN SALES OR EXCHANGES OF STOCK IN CERTAIN FOREIGN CORPORATIONS.

(a) GENERAL RULE.—If—

(1) a United States person sells or exchanges stock in a foreign corporation, or if a United States person receives a distribution from a foreign corporation which, under section 302 or 331, is treated as an exchange of stock, and

(2) such person owns, within the meaning of section 958(a), or is considered as owning by applying the rules of ownership of section 958(b), 10 percent or more of the total combined voting power of all classes of stock entitled to vote of such foreign corporation at any time during the 5-year period ending on the date of the sale or exchange when such foreign corporation was a controlled foreign corporation (as defined in section 957), then the gain recognized on the sale or exchange of such stock shall be included in the gross income of such person as a dividend, to the extent of the earnings and profits of the foreign corporation attributable (under regulations prescribed by the Secretary or his delegate) to such stock which were accumulated in taxable years of such foreign corporation beginning after December 31, 1962, and during the period or periods the stock sold or exchanged was held by such person while such foreign corporation was a controlled foreign corporation.

[5] SEC. 1248(e). SALES OR EXCHANGES OF STOCK IN CERTAIN DOMESTIC CORPORATIONS.—Under regulations prescribed by the Secretary or his delegate, if—

(1) a United States person sells or exchanges stock of a domestic corporation, or receives a distribution from a domestic corporation which, under section 302 or 331, is treated as an exchange of stock, and

(2) such domestic corporation was formed or availed of principally for the holding, directly or indirectly, of stock of one or more foreign corporations, such sale or exchange shall, for purposes of this section, be treated as a sale or exchange of the stock of the foreign corporation or corporations held by the domestic corporation.

[6] SEC. 957. CONTROLLED FOREIGN CORPORATIONS: UNITED STATES PERSONS.

(a) GENERAL RULE.—For purposes of this subpart, the term "controlled foreign corporation" means any foreign corporation of which more than 50 percent of the total combined voting power of all classes of stock entitled to vote is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b), by United States shareholders on any day during the taxable year of such foreign corporation.

Since Intapco was formed principally for the holding of stock in Ininco, and since Whitehead and Weiskopf were United States persons who owned 10 percent or more of the total combined voting power of Ininco, the application of section 1248 in this case turns on whether Ininco was a controlled foreign corporation as defined in section 957(a).

Petitioners contend that since 50 percent of the voting rights were held by Romney, a foreign corporation, Ininco is not a controlled foreign corporation within the definition of section 957(a). Respondent contends that Whitehead and Weiskopf, in effect, retained voting control of Ininco by virtue of the overall arrangement under which Romney purchased and retained its stock interest in Ininco.

It is clear that Romney owned, at least on the books, 50 percent of the voting rights in Ininco; therefore, it does not come within the literal definition of controlled foreign corporation. A mere technical compliance with section 957(a), however, is not sufficient to exclude petitioners from its application. *Hans P. Kraus*, 59 T.C. 681 (1973), affd. 490 F. 2d 898 (2d Cir. 1974); *Garlock, Inc.*, 58 T.C. 423 (1972), affd. 489 F. 2d 197 (2d Cir. 1973), cert. denied 417 U.S. 911 (1974). The 50-percent test of section 957(a) was intended to exclude from the definition of controlled foreign corporations only those foreign corporations which are not subject to the dominion and control of the United States shareholders. *Garlock, Inc., supra* at 433. We must determine whether the substance of the transaction in this case was that which the statute intended, specifically a real and meaningful ownership of at least 50 percent of the voting power in Ininco by non-United States shareholders.

While we recognize the rights of taxpayers to arrange their transactions in a manner intended to minimize tax liabilities, we also note that such transactions must have substance in order to achieve the intended result. See *Garlock, Inc., supra* at 434, and cases cited therein. After analysis of the evidence in this case, we hold that Whitehead and Weiskopf retained dominion and control of Ininco in spite of Romney's 50-percent voting interest. Ininco was therefore a controlled foreign corporation as defined in section 957(a) and section 1248 is applicable to the transfer of the Intapco stock to Hong Kong Holdings in 1966.

We rely heavily on the opinions of *Kraus v. Commissioner*, 490 F. 2d 898 (2d Cir. 1974), and *Garlock, Inc. v. Commissioner*, 489

F. 2d 197 (2d Cir. 1973), cert. denied 417 U.S. 911 (1974), in determining the relevant factors to be considered in deciding this issue.

Section 1.957–1(b)(2), Income Tax Regs., provides in part that "any arrangement to shift formal voting power away from United States shareholders of a foreign corporation will not be given effect if in reality voting power is retained." Section 1.957–1(b)(2) further provides in part that:

The mere ownership of stock entitled to vote does not by itself mean that the shareholder owning such stock has the voting power of such stock for purposes of section 957. For example, if there is any agreement, whether express or implied, that any shareholder will not vote his stock or will vote it only in a specified manner, or that shareholders owning stock having not more than 50 percent of the total combined voting power will exercise voting power normally possessed by a majority of stockholders, then the nominal ownership of the voting power will be disregarded in determining which shareholders actually hold such voting power, and this determination will be made on the basis of such agreement. Moreover, where United States shareholders own shares of one or more classes of stock of a foreign corporation which has another class of stock outstanding, the voting power ostensibly provided such other class of stock will be deemed owned by any person or persons on whose behalf it is exercised or, if not exercised, will be disregarded if the percentage of voting power of such other class of stock is substantially greater than its proportionate share of the corporate earnings, if the facts indicate that the shareholders of such other class of stock do not exercise their voting rights independently or fail to exercise such voting rights, and if a principal purpose of the arrangement is to avoid the classification of such foreign corporation as a controlled foreign corporation under section 957.

The Second Circuit, in the *Garlock* case, stated that "It is significant also that the terms of the arrangement worked out were such that the preferred shareholders would have no interest in disturbing the taxpayer's continued control." That factor applies to the present situation. Romney was given an investment interest which was made attractive by paying a dividend rate in excess of the market for money advanced. Also, by virtue of the articles of association of Ininco and the shareholders' agreement dated November 29, 1963, Romney had a quite limited stake in the business. The articles of association provided that, upon liquidation, Romney was entitled only to a return of the par value of the stock (i.e., Romney's investment in the corporation). The shareholders' agreement entered into by Romney and Intapco provided that, upon sale of its stock, Romney had to offer its stock interest in Ininco to Intapco at a price measured by the

amount to be received upon liquidation. Thus, as a practical matter, Romney could expect to receive only a return of its investment whether it attempted to sell its interest or forced a liquidation of Ininco.

Petitioners argue that both Romney and Intapco were subject to the requirement that their interest in Ininco be offered first to the remaining shareholders and therefore these provisions could not have been utilized by Whitehead and Weiskopf to retain control over Ininco. As a practical matter, provisions of the articles of association and the shareholders' agreement dated November 29, 1963, did serve the purpose of ensuring that Romney had no real interest in disturbing control of Ininco, as it could only obtain a return of its investment no matter which method it followed. If Intapco offered its interest in Ininco to Romney, the latter would have been required to pay Intapco whatever profits had been accumulated in Ininco. Even if Romney wished to pay Intapco this amount, any incentive to do so was negated by the fact that the business of Ininco was dependent upon a continued supply of AutoAnalyzers from Limited. Since the owners of Intapco also controlled Limited and thereby could, and eventually did, cut off sale of AutoAnalyzers to Ininco, the rights possessed by Romney lacked any real substance. It is thus clear that Romney had little, if any, interest in disturbing the effective control of Ininco by Whitehead and Weiskopf through Intapco and Limited.

A second factor which indicates that Whitehead and Weiskopf retained control and dominion over Ininco despite Romney's 50-percent voting rights was retention of complete and unfettered control by Limited over Ininco's only product line, the AutoAnalyzer. Since Ininco had no contract with Limited assuring it of any supply beyond current orders, the use of Ininco as an exporting business could have been halted at any time by a firm over which Whitehead and Weiskopf had control. Whitehead testified that he was aware that he could stop supplying the AutoAnalyzers to Ininco and thereby "essentially" terminate its business.

The shareholders' agreement dated November 29, 1963, further strengthened the control which Whitehead and Weiskopf had over Ininco by providing that, after dissolution of or sale of stock in Ininco, the shareholders had no rights with respect to continued handling of its product lines. Since Whitehead and

Weiskopf were the sole shareholders of Technicon, whose wholly owned subsidiary was Limited, and thus had control over the manufacture of the AutoAnalyzer, the agreement realistically served only to prevent Romney from any future rights to the use of the AutoAnalyzer should Limited decide to cut off the supply of the products to Ininco. These circumstances further lessened the possibility that Romney would have any interest in disturbing or challenging the control of Whitehead and Weiskopf. Although we find it difficult to believe that a party with 50 percent of the voting power of a corporation would enter into an arrangement in which its only product line could be withdrawn at any time by action of the remaining 50-percent shareholders, we do not foreclose the possibility that such an arrangement might be entered into at arm's length. When, however, these circumstances are present in conjunction with other factors indicating that dominion and control are possessed by United States shareholders, the control which Whitehead and Weiskopf maintained over the continued supply of the AutoAnalyzer becomes a significant factor.

Petitioners have made much of the fact that Ininco was set up as a "deadlock" company with neither Intapco nor Romney holding the power to control the votes of the board of directors. They also cite the November 29 shareholders' agreement wherein the parties "in view of the even division of control" agreed to endeavor to avoid a deadlock situation and the rights to arbitration in case of differing interpretations of that agreement. This Court and the Second Circuit in the *Garlock* case viewed the presence of an arbitration provision to be an unrealistic business solution. In any event, any deadlock which occurred in running Ininco could have been solved by Whitehead and Weiskopf by merely terminating Ininco as a seller of the AutoAnalyzers, as it in fact did, when the OTC provisions were repealed.

Furthermore, Romney got 50 percent of the voting shares in Ininco for which it paid 25,000 pounds. In return it got an assured 12½-percent dividend and, by virtue of the articles of association of Ininco and the November 29, 1963, shareholders' agreement, only the right to a return of its investment upon sale or liquidation. It defies credulity that Romney would have advanced more money than Intapco and received only 12½ percent of the dividends to be paid by a company that was to be

exempt from United Kingdom taxes on its profits if it truly obtained 50 percent of the voting power of that company.

Any remaining doubt as to the control and domination which Whitehead and Weiskopf retained over Ininco is resolved upon examination of the manner in which Ininco was terminated and the holdings of Romney were eliminated. After it was learned that the OTC provisions were to be repealed, Whitehead and Weiskopf, in discussions with Carr, decided that Ininco would no longer serve any useful purpose and that it should be terminated. Carr, after conference with others, concluded that a sale of stock to a Hong Kong corporation provided the best means taxwise of "getting rid of" Ininco. Carr then approached Hong Kong Holdings to arrange for sale of the stock and eventual liquidation by it of Ininco. In anticipation of this sale, Weiskopf, Whitehead, and Intapco entered into an agreement whereby Weiskopf was to exercise his option. This agreement was dated December 6, 1965. On December 22, 1965, Franklin wrote Carr a letter concerning their conversation "yesterday" regarding the possible sale of Romney's interest in Ininco. Thus, Carr approached Franklin after the transfer of Intapco's interest in Ininco had been arranged. Even Romney's limited rights under the shareholders' agreement were ignored by petitioner. Moreover, Carr testified that he went to Franklin to ask "whether he was prepared to dispose of or deal with his holding of Romney because Intapco of New York weren't going to use or Technicon Instruments weren't going to use Ininco again." Romney had no viable alternative but to sell its interest in Ininco to the buyer which Carr had located. If it refused to do so, the most that it could have done was force a liquidation or offer its stock interest to Intapco and receive a return of its investment. Since Intapco, by unilateral decision, had decided to cut off the supply of Ininco's only product line, it would be unrealistic to argue that Romney had any choice but to assent to sale of its interest in Ininco. Thus, even though Romney possessed 50 percent of the voting rights of Ininco, it lacked any real or meaningful power to influence decisions affecting the future of Ininco or its business.

Petitioners contend that Romney agreed to sell its interest in Ininco only after being promised and receiving a premium over and above the normal dividend rate. This contention apparently is offered to show that Romney acted independently of Intapco and asserted its power as a 50-percent owner of the voting rights

in Ininco. We cannot accept petitioners' contention. First, the facts are unclear whether such a premium was paid. Second, the payment of a premium of 900 pounds from a corporation whose net worth had increased from 45,000 pounds upon incorporation to over 800,000 pounds in less than 3 years does not appear to be sufficient incentive to induce a party to give up its ostensible 50-percent ownership of that corporation. To the contrary, the 900 pounds premium, if paid, appears to be a "nuisance value" payment intended to prevent Romney from forcing liquidation, which could have resulted in the imposition of a 40-percent United Kingdom tax on the earnings to be distributed to Intapco.

A final factor in determining that Whitehead and Weiskopf retained dominion and control over Ininco is an examination of the overall transaction. The primary corporation throughout this period was Technicon. The entire transaction was arranged so that this business, through affiliates, would keep control of the sale of the AutoAnalyzer and expand its worldwide business. Thus, Ininco was utilized to service and expand a worldwide market previously supplied by Technicon. At the same time, funds accumulated in Ininco because of its exempt tax status were utilized to provide credit for the establishment of foreign offices (Technicon affiliates) which would sell AutoAnalyzers in foreign countries. After repeal of the OTC provisions rendered Ininco of little use to Technicon, Whitehead and Weiskopf terminated its business by cutting off its supply of AutoAnalyzers and transferring its worldwide manufacturing and selling operation to Ireland.

Romney was powerless to alter the course of these events in any meaningful way even though it had 50 percent of the voting rights of Ininco. It was, by virtue of the articles of association and the shareholders' agreement dated November 29, 1963, in a position only to force liquidation of Ininco. Furthermore, the operation of Ininco was run as if it were merely a Technicon or Limited affiliate. Evans acted as virtual managing director of Ininco, as well as director of Limited. Also, the business of Ininco was operated from the offices of Limited. The overall effect of these facts leaves no doubt that Whitehead and Weiskopf retained complete dominion and control over Ininco during its entire period of incorporation.

Having found that Ininco was a controlled foreign corporation, we must consider several contentions made by petitioners

concerning respondent's computation of tax under section 1248. Section 1248 provides that the gain recognized on sale or exchange of stock in a controlled foreign corporation is treated as a dividend to the extent of that corporation's earnings and profits accumulated in taxable years after 1962 and during the period the United States shareholder held the stock. Sec. 1.1248–1(a), Income Tax Regs. The first computation issue concerns determination of Ininco's earnings and profits, which rests upon characterization of the transfer of Intapco's stock to Hong Kong Holdings. Petitioners for both parties contend that the transfer of the Intapco stock to Hong Kong Holdings resulted in a sale which terminated their interest at that time and that Ininco was subsequently liquidated by Hong Kong Holdings. Acceptance of this contention would result in Ininco qualifying as a controlled foreign corporation only until the date of the transfer and the reduction of Ininco's earnings and profits in the amounts of the distributions made to Hong Kong Holdings after such transfer. Sec. 1.1248–3(b)(3), Income Tax Regs. Respondent contends that the transfer of Intapco stock and subsequent distribution to Hong Kong Holdings were in substance a liquidation of Ininco by Whitehead and Weiskopf.

Petitioners preliminarily raise a procedural issue. They contend that additional arguments raised by respondent in his amended answer constitute "new matter" within the meaning of Rule 142, Tax Court Rules of Practice and Procedure, and therefore respondent bears the burden of proof with regard to those arguments. We do not accept petitioners' contention. The notice of deficiency informed petitioners of respondent's position that the provisions of section 1248 apply to the transaction between Hong Kong Holdings, Intapco, and Romney. Petitioners then had the burden of proving that section 1248 did not apply or that respondent's determinations of earnings and profits used to apportion their gain was incorrect. This is especially so in light of section 1248(g) which requires generally that the taxpayers were required to establish the amount of earnings and profits of the foreign corporation. This Court has held that a new position taken by respondent is not necessarily a "new matter" especially when it merely clarifies or develops the original determination without being inconsistent or increasing the amount of deficiency. *Estate of George W. Jayne*, 61 T.C. 744, 748–749 (1974), on appeal (7th Cir., Sept. 16, 1974); *Rozelle McSpadden,*

50 T.C. 478, 492–493 (1968). The arguments raised in respondent's amended answer involve the same Code section, are consistent with his original determination, and do not affect the amount of the deficiency. We hold that petitioners retain the burden of proof.

With regard to the characterization of the overall transaction, we find for respondent. Even though a transaction is put in the form of a sale, if it in fact results in an effective liquidation, it will be given such recognition. *John D. Gray*, 56 T.C. 1032 (1971), on appeal (9th Cir., Sept. 18, 1974). There is no doubt that the sole reason for the arrangement between Intapco and Hong Kong Holdings was the liquidation of Ininco in a manner that would permit Whitehead and Weiskopf to minimize taxes paid to the United Kingdom. Carr testified that Ininco was no longer to be used by Whitehead and Weiskopf and that consideration turned to the "methods of getting the money out of the company the best possible way and we put a suggestion to Intapco that everybody sell their shares to a company in Hong Kong where there is a new tax provision and then the Hong Kong Company would take out a dividend in gross which would mean all the profits of the company accumulated over the years which would make the company really 40 percent more valuable than it would be if it was dealt with in England. They agreed to that." It is thus clear that the intent was to find a corporation willing to acquire the stock of Intapco and the holdings of Romney in Ininco and then withdraw the earnings from the corporation.

Petitioners argue that Hong Kong Holdings purchased stock in a viable corporation which continued in the business of collecting accounts receivables. We cannot accept petitioners' contention. See *E. Keith Owens*, 64 T.C. 1 (1975). Ininco, prior to repeal of the OTC provisions, was a very active business engaged in the sale of AutoAnalyzers. After repeal of the OTC provisions, Ininco's sole product line was withdrawn by Limited. Thus, Hong Kong Holdings was purchasing nothing more than a corporation with accumulated earnings and accounts receivables. Petitioners in substance were selling nothing more than cash encased in a corporate shell. *E. Keith Owens, supra,* and *John D. Gray, supra* at 1068. Hong Kong Holdings did not acquire, nor is there any evidence that it intended to acquire, a viable business corporation. This is attested to by the fact that Hong Kong Holdings did not solicit any new orders for AutoAnalyzers.

Petitioners' final contention is that there was no agreement on the part of Hong Kong Holdings to liquidate Ininco. From a purely technical standpoint this may be correct. It is clear, however, from the agreement between Hong Kong Holdings, Weiskopf, and Whitehead that liquidation of Ininco by Hong Kong Holdings was an integral part of the arrangement. The agreement provided that "in the event that the Purchaser [Hong Hong Holdings] shall fail before the date on which the liquidation of Ininco commences to satisfy the Commissioners," then the purchaser shall be entitled to rescind the transaction. This provision indicates not only that the parties fully intended Hong Kong Holdings to liquidate Ininco but that without liquidation of that corporation under favorable United Kingdom tax conditions the arrangement would be rescinded by Hong Kong Holdings. It certainly was the overall intent of the parties to use the accumulated earnings of Ininco (untouched by United Kingdom tax) to pay Whitehead and Weiskopf for their stock interests in Intapco. Hong Kong Holdings could have chosen to keep Ininco alive but it would have only possessed a corporate shell devoid of the business which it transacted prior to the agreement.

Section 1248 was enacted to provide "the imposition of the full United States tax when income earned abroad is repatriated." S. Rept. No. 1881, 87th Cong., 2d Sess., p. 1 (1962), 1962–3 C.B. 707, 813. To allow taxpayers to avoid imposition of the full tax on a good portion of the accumulated earnings of a controlled foreign corporation by an arrangement whereby the earnings are paid to a third party after a "sale" would be in complete derogation of section 1248 and its legislative history. We hold for respondent on this issue. We find that the sale of Intapco stock was in substance a liquidation of Ininco at that time, with the remaining distributions made to Hong Kong Holdings being liquidating distributions. See *John D. Gray, supra.*

Whitehead concedes that, once it is determined that a liquidation of Ininco resulted rather than sale, its computation questions become moot. Weiskopf, however, raises several more computational questions.

Counsel for Weiskopf contend that respondent erred in attributing one-half of the earnings and profits of Ininco to Weiskopf. They contend that for years 1964 and 1965 Weiskopf owned preferred stock and therefore only the earnings and profits

representing the fixed dividends that would have been received by him if all earnings and profits had been distributed are attributable to him. With regard to taxable year 1966, Weiskopf contends that he owned the common stock for 1 day during that year, and therefore under section 1.1248–3, Income Tax Regs., the earnings and profits accumulated during that year must be allocated between the shareholders (Whitehead and Weiskopf) according to the number of days that the stock was held during that year. Respondent contends that Weiskopf is considered to be the owner of 50 percent of the common stock from the inception of Ininco and therefore 50 percent of the accumulated earnings and profits should be attributed to him.

Section 1.1248–1(a)(1), Income Tax Regs., generally provides that if a United States person recognizes gain on a sale or exchange of stock in a foreign corporation, that gain shall be included in the gross income of such person as a dividend to the extent of the earnings and profits of such corporation attributable to such stock which were accumulated in taxable years beginning after December 31, 1962, "during the period or periods such stock was held (or was considered as held by reason of the application of section 1223) by such person while such corporation was a controlled foreign corporation." Respondent argues that the holding period for Weiskopf's common stock includes the period during which he held the preferred stock under section 1223.[7] Petitioner apparently does not contest the applicability of section 1223 to the common stock obtained by Weiskopf.[8] In this connection we note that the parties have stipulated that Weiskopf's basis for his investment in Intapco at the time of the transaction with Hong Kong Holdings (at which time he owned common and preferred stock) was $49,000, the same amount

---

[7] SEC. 1223. HOLDING PERIOD OF PROPERTY.
For purposes of this subtitle—
(1) In determining the period for which the taxpayer has held property received in an exchange, there shall be included the period for which he held the property exchanged if, under this chapter, the property has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as the property exchanged, and, in the case of such exchanges after March 1, 1954, the property exchanged at the time of such exchange was a capital asset as defined in section 1221 or property described in section 1231. For purposes of this paragraph—
(A) an involuntary conversion described in section 1033 shall be considered an exchange of the property converted for the property acquired, and
(B) a distribution to which section 355 (or so much of section 356 as relates to section 355) applies shall be treated as an exchange.
[8] We make no finding with regard to the issue whether the exchange of preferred for common stock by Weiskopf resulted in a transaction to which sec. 1223 applies.

which he paid for acquisition of preferred stock in 1963. Petitioner merely argues that the Commissioner has misapplied section 1223 to the present case.

Section 1.1248–1(a), Income Tax Regs., which petitioner does not attack, clearly provides that a shareholder is considered to have held his stock during the entire period to which section 1223 applies. In this case Weiskopf is considered to own the common stock from the inception of Ininco. We therefore hold for respondent on this issue.

Petitioners' final contention is that the limitation on tax applicable to individuals was incorrectly determined by respondent. They contend the taxable income should be determined by reducing earnings and profits by the amount of distributions made to Romney. Sec. 1.1248–4(d)(8), Income Tax Regs. Ininco clearly paid dividends to Romney. These regulations are applicable in this case. Respondent's determination should be adjusted accordingly.

*Decisions will be entered under Rule 155.*