CCA, INC. (FORMERLY CONTROLS COMPANY OF AMERICA, TRANSFEROR, AN ILLINOIS CORPORATION), CONTROLS COMPANY OF AMERICA (FORMERLY CATHERINE CORPORATION, TRANSFEREE, A DELAWARE CORPORATION), PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

THE SINGER COMPANY, AS SUCCESSOR BY MERGER TO GENERAL PRECISION EQUIPMENT CORPORATION AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RE-SPONDENT

Docket Nos. 6524-71, 3628-72.    Filed May 6, 1975.

*Michael Waris, Jr., Donald Baker,* and *David W. Welles,* for the petitioners.
*Seymour I. Sherman,* for the respondent.

WILES, *Judge:* Respondent determined that petitioner Controls Co. of America [1] (hereinafter referred to as new CCA) is liable as the transferee of the assets of CCA, Inc., for the years and in the amounts as follows:

| Year | Deficiency |
| --- | --- |
| 12/31/64 | $312,459.09 |
| 12/31/65 | 320,728.34 |

Respondent also determined that petitioner Singer Co. is liable as successor by merger to General Precision Equipment Corp.

---

[1] On or about June 1, 1967, new CCA executed a Form 2045 Transferee Agreement with respect to the tax liability of CCA, Inc. (formerly old CCA), for, inter alia, its taxable years 1964 and 1965.

(hereinafter referred to as GPE) for deficiencies for the years and in the amounts as follows:

| Year | Deficiency |
|---|---|
| 12/31/66 | $254,231.88 |
| 1/1/68 to 7/11/68 | .2 4,398.19 |

Several issues have been settled by the parties. The only remaining issue for decision is whether a Swiss corporation is determined to be a controlled foreign corporation within the meaning of section 957(a).[3]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Controls Co. of America (hereinafter referred to as old CCA) was organized under Delaware law on January 29, 1953. During the period December 1, 1963, until its liquidation on or about March 16, 1967, and at all times pertinent prior thereto, its principal office was in Melrose Park, Ill. It filed its corporate Federal income tax returns (Form 1120) for the calendar years 1964 and 1965 with the District Director of Internal Revenue at Chicago, Ill. At the time the petition in docket No. 6524-71 was filed the principal place of business and principal office of CCA, Inc. (successor to old CCA), and Controls Co. of America (formerly Catherine Corp., transferee, a Delaware corporation) was Melrose Park, Ill.

The Singer Co. is the successor by merger on July 11, 1968, of GPE and its subsidiaries, including new CCA. Consolidated Federal income tax returns were filed for GPE and subsidiaries (including new CCA) for the calendar years 1966 and 1967 and for the period January 1, 1968, to July 11, 1968, with the District Director of Internal Revenue at New York, N.Y. At the time the petition in docket No. 3628-72 was filed the principal places of business and principal offices of the Singer Co., GPE, and old CCA were respectively, New York, N.Y., Tarrytown, N.Y., and Melrose Park, Ill.

On or about June 23, 1958, old CCA organized a Swiss corporation known as Control AG (hereinafter referred to as AG) with the principal office at Zug, Switzerland, as a wholly owned

---

[2] An overassessment of $2,806.01 for calendar year 1967 is not in dispute.

[3] All statutory references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise indicated.

subsidiary. From the date of incorporation to November 30, 1963, old CCA owned beneficially all of AG's issued and outstanding capital stock, which, as of the close of business November 29, 1963, consisted of 800 common shares having a par value of 1,000 Swiss francs per share. For purposes of compliance with the requirements of Swiss corporate law, 1 share of AG common stock stood in the name of each of the persons elected by old CCA as a director of AG during their respective terms of office.

The articles of incorporation of AG that were in effect from June 23, 1958, to November 30, 1963 (hereinafter referred to as the 1958 articles), provided for a board of directors consisting of not less than three nor more than five members who were required to be shareholders. Although the 1958 articles referred to the board as a board of directors, the governing body in Swiss corporations is generally referred to as a board of administrators and the articles of incorporation as amended, in effect, on and after November 30, 1963, did so refer to the governing body of AG. The 1958 articles provided that the managing director had the power to bind a corporation singly but that members of the board had the power to bind the corporation only jointly. The 1958 articles also provided that in case of a tie the vote of the chairman is decisive. The 1958 articles stated that the duration of the corporation is perpetual. With regard to transfers of stock the 1958 articles provided as follows:

> The Corporation keeps a stock register book in which the names and addresses of the shareholders are entered. Only persons registered in the stock register book are recognized as shareholders by the Corporation. The registration shall be certified on the share certificate by a member of the Board of Directors. The Board of Directors may refuse the registration of a shareholder without having to state a reason.

Bylaws for AG were adopted by old CCA in June 1958. The bylaws provided that shareholder approval was required for various activities of the business, including investments and establishing branch offices outside of Switzerland. They also provided that unanimous votes by the board were necessary for contracting or granting loans in excess of 40,000 Swiss francs but less than 400,000 Swiss francs or in any amount to be paid over a period exceeding 1 year, and for appointing persons for the management of the company who are not board members and

designating their powers, duties, and rights. The bylaws were suspended on November 30, 1963.

AG was initially created for the purpose of exporting old CCA's products from the United States. On May 1, 1959, old CCA entered into an agreement with AG whereby the latter was granted the exclusive right to use (and permit others to use) in any country except the United States, Canada, or the Netherlands, "the designs, technical know-how and manufacturing information and processes of [old] CCA." The agreement also granted AG the exclusive right (including the right to license others) under patents listed in the agreement. A sublicense could exceed the life of the agreement subject to approval by old CCA. The agreement further provided AG the exclusive use, within Switzerland, of trademarks listed in the agreement and those which are acquired by old CCA during the life of the agreement. The agreement was to remain in effect until May 1, 1965, and from year to year thereafter until terminated by either party after 90 days' written notice. AG then expanded with manufacturing plants in other European countries. The operation of these subsidiaries was financed by a small investment by AG and by loans from AG which in turn were subordinated to loans of local banks in each of the countries.

Under the laws of Switzerland when a board of administrators is composed of more than one member the majority must be Swiss citizens domiciled in Switzerland. If this requirement is not complied with the registrar shall fix a time limit for complying with the legal requirements and in case of default shall declare the company ex officio dissolved.

The board of administrators of AG from September 18, 1963, through November 29, 1963, were:

Louis Putze [4]
Ernest M. Krell [5]
Arnold Weinmann [6]
Dr. Philipp Schneider [6]
Andreas Leibundgut [6]

Louis Putze (hereinafter referred to as Putze) was one of the cofounders of old CCA. He was president and a member of the

---

[4] United States citizen residing in the United States.
[5] United States citizen residing in Switzerland.
[6] Swiss citizen residing in Switzerland.

board of directors of old and new CCA from incorporation. From 1966-68, Putze was a member of the board of directors of GPE. Ernest M. Krell (hereinafter referred to as Krell) was an employee of and managing director of AG prior to November 30, 1963, until August 1966. In accordance with Swiss law, each member of the board held 1 qualifying share of AG common stock, the beneficial ownership of which was owned by old CCA. From 1958 to November 30, 1963, old CCA retained control over AG's board of administrators by electing members who were loyal to old CCA.

Upon passage of the Revenue Act of 1962 (hereinafter referred to as the 1962 Act), representatives of old CCA became concerned with the possible adverse effects of the controlled foreign corporation provisions on its European operations. Old CCA contacted its attorneys and accountants in order to determine if it could comply with the Revenue Act of 1962 and still take advantage of the tax-deferral provisions. Upon advice of counsel, old CCA decided to "decontrol" AG. In a board of directors meeting of old CCA held on September 24, 1963, reorganization of the European operation was discussed as follows:

> Attention was next brought to the fact that the Revenue Act of 1962 has adversely affected the operations of the base company Controls AG. This matter had been studied and Mr. Roy W. Johnson, Chairman of the Board, advised that he had appointed a special committee of Directors to consider the matter consisting of A. R. Gale, Chairman, James H. Douglas, Jr., George Weymouth, and Mr. Johnson. At this point Mr. Gale reported concerning the activities of the Committee and their tentative recommendations. In that connection a report by Baker, McKenzie & Hightower, consultants to the Company in foreign matters, was circulated and reviewed and discussed by the Directors, following which it was determined that a further study should be made and a meeting held with said consultants. It was expected that such meeting would be held at an early date to enable the Board to take appropriate steps without undue delay.

On October 28, 1963, a letter from Fred H. McElhone, secretary of old CCA, to Putze contained a consent to action by the members of old CCA's board of directors without a meeting to establish the following program:

> Basically, the program involves transferring stock equities from Controls Aktiengesellschaft (Controls A.G., the Swiss company) to Controls Maatschappij Europa N.V. and then issuing a new preferred stock by Controls A.G. with 50% of the voting power. This will leave ownership of all of our operating companies in Holland which is owned 100% by Controls Company and leave Controls Company with 50% control of the Swiss service company.

Between October 14, 1963, and November 5, 1963, old CCA contacted various European brokers with regard to placement of the proposed issue of preferred stock. Correspondence to these brokers from A. E. Kornhauser (hereinafter referred to as Kornhauser), treasurer of old CCA, indicated that the primary concern of old CCA in issuing the preferred stock was conformity with the Revenue Act of 1962. Letters to some brokers also stated that the preferred stock must be sold to investors not related in business to old CCA and which cannot be deemed to be under their influence. "In other words, they should be bona fide long-term investors." In a letter dated October 14, 1963, to a European broker, Kornhauser stated that:

> In view of the short time that we have to place these shares, we have decided that if it becomes necessary in order to satisfy our prospective investors with respect to the safety of principal and continuity of income, Controls Company of America will provide a right or put to the investor to sell his shares to Controls Company of America at par plus accrued dividends.

In a letter dated November 5, 1963, Kornhauser told another broker that "any formal agreement on the part of the preferred shareholders to sell their shares to Controls Company or its designee would in effect give us a call on the issue." He therefore indicated that any such provision should be removed. During this same period, old CCA sought investment in the proposed preferred stock issue by a United States institutional investor to the extent of a 9-percent interest, so that such investor would not be classified as a United States shareholder under provisions of the 1962 Act.

On November 8, 1963, AG transferred to Controls Maatschappij Europa N.V. (hereinafter referred to as CME), a wholly owned Dutch subsidiary of old CCA, for 6,029,804.75 Swiss francs, all of its stock in the following subsidiaries:

| Name | | AG's percentage of ownership |
|---|---|---|
| Controls Co. of America (U.K.) Ltd. | 150,000 shares | 100 |
| Controls France S.A. | 29,972 shares | 100 |
| Controls Co. Italia S.p.A. | 99,999 shares | 100 |
| Controls Co. of America (Argentina) S.A. | 59,300 shares | 50 |
| Controles Automaticos Sermar Ltda. | 53,000 parts | 50 |

The transfer of the manufacturing subsidiaries from AG to CME was not a simple or routine transaction. The decision to make this transfer had been reached in mid-October and had to be

completed within 6 weeks. Clearance had to be obtained from the Swiss and Dutch tax authorities and the corporate and tax laws of England, France, Italy, Holland, Switzerland, Argentina, and Brazil had to be reviewed. The cost of the transfer was approximately $30,000-$35,000.

On November 29, 1963, the board of administrators of AG resolved to increase the capital stock of AG by issuing 800 6-percent preferred nominative shares of 1,000 Swiss francs par value each, fully paid. Each share of common stock and each share of preferred stock was entitled to one vote. This resolution was approved by the shareholders of AG on November 30, 1963. Swiss Credit Bank and Bank und Finanz-Institut A.G., Swiss corporations, each subscribed to 400 shares of the preferred stock of AG, and by November 30, 1963, had placed said shares with the University of Wisconsin Trust and four Swiss corporations. Preferred stock ownership in AG during the period from November 30, 1963 through 1968, was as follows:

| Preferred shareholders | Number of shares | | |
|---|---|---|---|
| | 11/30/63-64 | 1965-66 | 1967-68 |
| Clariden Finanz AG | 400 | 400 | |
| Allgemeine Treuhand AG | 50 | 50 | 50 |
| Vermogensverwaltung Sonnenberg AG | 100 | 100 | 100 |
| Bank und Finanz-Institut AG [7] | 150 | 50 | 50 |
| University of Wisconsin Trust | 100 | 100 | 100 |
| Kasimir R. Wiki | --- | 50 | 50 |
| Dr. Heinrich Wiki | --- | 50 | 50 |
| Faminta AG | --- | --- | 200 |
| Schweizerische Kreditanstalt (Swiss Credit Bank) | --- | --- | 200 |

Swiss law required that members of the board of administrators have nominal title to 1 share of stock of the interest which they represent. Therefore, the representatives of the preferred stockholders of the board held qualifying shares for the preferred shareholders which they represented, the nominal ownership of which is not reflected in the above.

From November 30, 1963, through July 11, 1968, the only classes of stock of AG authorized, issued, and outstanding were 800 shares of common stock and 800 shares of preferred stock, both classes having a par value per share of 1,000 Swiss francs. Each share of common stock and each share of preferred stock was entitled to one vote. From November 30, 1963, through

---

[7] Bank und Finanz-Institut AG is a subsidiary of Allgemeine Treuhand AG.

July 11, 1968, the 800 shares of common stock of AG were beneficially owned by old CCA or new CCA. The AG preferred stock was owned at all times only by persons who are not United States shareholders and the ownership of such stock may not be attributed under any provision of the Internal Revenue Code of 1954 to old CCA or new CCA or to any other person.

AG's articles of incorporation were amended on November 30, 1963 (hereinafter referred to as 1963 articles), by public deed at a special meeting of shareholders. Articles of incorporation of a Swiss company commonly contain a provision giving the chairman of the board of administrators the power to break a tie vote; however, the 1963 articles contained no such provision. With regard to transfer of shares of stock, the 1963 articles provided as follows:

> The Corporation shall maintain a stock register in which the names and addresses of the shareholders are entered. Only persons registered in the stock register shall be recognized as shareholders by the Corporation. The registration of a shareholder in the stock register shall be certified on the share or the share certificate by the signature of a member of the Board of Administrators. The Board of Administrators' approval is required for each registration, and it may refuse to register a new shareholder without indicating any reason for such refusal.

The 1963 articles provided for a 10-member board of administrators, 5 each to be nominated by the common and preferred shareholders. Under Swiss law, if an administrator retired, resigned, or otherwise ceased to be an administrator, the same class of stock that nominated him would nominate his successor.

The 1963 articles also provided that 1/20 of the yearly net profits shall be transferred to a statutory reserve fund until such fund amounts to 1/5 of the paid-in capital. The remaining net profits are to be distributed to the preferred shareholder as a 6-percent cumulative preferred dividend to be paid within 2 months after a meeting of shareholders declaring such dividends and provided that there are net profits from the current year or profits brought forward.

The 1963 articles also provided that no dividends were to be paid to the common shareholders until such time as any dividends in arrear on the preferred shares had been paid. The preferred shareholders were not entitled to any dividends other than the 6-percent cumulative preferred dividend. The

remaining net profits were to be at the disposal of the meeting of shareholders which may decide to declare dividends to the common shareholders or to open additional reserve accounts. The 1963 articles provided that the meeting of shareholders would have the exclusive power to decide upon the use of such additional reserve. The 1963 articles also provided for distributions of assets upon dissolution of the corporation. They provided that the preferred shareholders were to have preference on distribution prior to the common shareholders as follows:

(1) In case of involuntary liquidation they were to get a return strictly of the par value of their shares.

(2) In case of voluntary liquidation they were to receive par value plus a premium of 5 percent.

They were also to receive any unpaid dividends exclusive of interest to which they were entitled on the date of the corporation's dissolution. After the claims to the preferred shareholders were satisfied the remaining balance, if any, was to be distributed to the common shareholders in proportion to their shareholdings.

After November 30, 1963, AG's board consisted of 10 members. Five of such members were appointed by and represented the common shareholders. During the period from November 30, 1963, through July 11, 1968, the preferred shareholders appointed and were represented by Dr. Damian Bossard, Dr. Robert Gubler, Karl Staubli, Hans P. Gerber, and Dr. Heinrich Wiki.[8] As required by Swiss law, each owned a director's qualifying share of preferred stock beneficially owned by the preferred shareholders which each represented. Each member was also a Swiss citizen residing in Switzerland.

Under provisions of Swiss law the authority of anyone, including a member of a Swiss company's board of administrators, to represent the company and to exercise executive powers is founded on "signature power" as evidenced by registry in the Swiss commercial register. All the members of AG's board of administrators representing the preferred stock had joint signature power. That is, any two of the members of AG's board of administrators acting jointly had the executive

---

[8] While they served as administrators, they were engaged in business as follows: Gerber was a banker with Finanz-Institut; Bossard was a branch manager for Swiss Credit Bank; Gubler and Staubli were on the staff of Swiss Credit Bank; and Wiki was a practicing Swiss attorney and vice-manager of the Zurich branch of Allgemeine Treuhand.

power to represent AG vis-a-vis the outside world. Any restrictions of these powers would be void as regards bona fide third parties unless they were entered in the commercial register. No such restrictions were entered in the commercial register.

Under Swiss law, any restriction on the voting rights of shareholders of a Swiss company or on their right to be represented by proxy will not be recognized unless such provision is contained in the articles of incorporation. The 1963 articles contained no provision restricting the voting rights of shareholders except for a requirement that obligated both common and preferred shareholders to vote for each group's nominee to the board of administrators. This obligation was unconditional "provided that there are no important reasons to the contrary." Also under Swiss law, preferred shares of a Swiss company rank equally in all respects with common shares of a Swiss company except as provided in the articles of incorporation.

On December 1, 1963, AG and old CCA entered into a licensing agreement for all countries of the world except North, Central, and South America, Australia, Malaysia, New Zealand, Formosa, Hong Kong, Japan, Korea, Okinawa, and the Netherlands. The agreement provided that AG was granted the exclusive right to use (and permit others to use) "the designs, technical know-how and manufacturing information and processes of [old] CCA." The agreement also granted AG the exclusive right to use (and grant sublicenses using) patents listed in the agreement and to use, within Switzerland, patents listed in the agreement. The agreement was to remain in effect until December 31, 1968, and from year to year thereafter unless terminated by either party after a default or through written notice given 90 days prior to the expiration of the original term or renewal period. The agreement between old CCA and AG could not be assigned, in whole or in part, by either party without the prior written consent of the other party.

On February 23, 1966, GPE formed the Catherine Corp. as a wholly owned subsidiary for the purpose of acquiring the business and substantially all the assets of old CCA. On or about February 26, 1966, old CCA, GPE, and Catherine Corp. entered into an agreement and adopted a plan of reorganization dated March 8, 1966. On or about May 20, 1966, the foregoing agreement and plan of reorganization was put into effect as follows: Catherine Corp. acquired substantially all of the assets and assumed

substantially all of the liabilities of old CCA. GPE issued its voting common stock ($1 par value) and voting cumulative convertible preferred stock (without par value) to old CCA. GPE also assumed obligations under certain options outstanding pursuant to old CCA's stock option plan. Old CCA changed its name to CCA, Inc.; Catherine Corp. changed its name to Controls Co. of America (new CCA). Old CCA distributed the shares of GPE common and preferred stock to its shareholders in exchange for their stock in old CCA. Old CCA was liquidated on or about March 16, 1967.

The transfer of the common shares of AG from old CCA to the Catherine Corp. in anticipation of the merger with GPE was approved by the board of administrators at a meeting held on April 29, 1966. Present at the meeting were all five board members who represented the preferred shareholders. Krell and Dr. Philipp Schneider were the only members representing the common shareholders who were present at the meeting.

Under Swiss law, the board of administrators of a Swiss company exercises powers ordinarily exercised by both the board of directors and officers of a United States corporation. Under provisions of Swiss law, shareholders of a Swiss company can only receive dividends if the meeting of shareholders declares dividends.

During the period November 30, 1963, through July 11, 1968, AG held its ordinary shareholders meeting annually, except for an additional special shareholders meeting held on August 22, 1966. Although under Swiss law a board of administrators may delegate the management and representation of the company to a board member or members or third parties, AG's board made no such delegation. As a result, the right of management and representation of AG rested jointly with all members of the board.

There were no express agreements, written or oral, between the parties involved with respect to the manner in which the preferred stockholders would vote their stock. There were no express understandings or other kind of agreements between the parties with regard to any preferred shareholder refraining from voting his stock in the manner his judgment and interests dictated.

During the period November 30, 1963, through July 11, 1968, there were five regular shareholders meetings and one special

shareholders meeting. With the exception of the University of Wisconsin Trust, the preferred shareholders were represented through proxy by members of the board who represented the preferred shareholders. On three occasions, the University of Wisconsin Trust was represented through proxy by Peter D. Lederer, an attorney for the law firm which represented old CCA. During the shareholders meetings, the preferred shareholders' representative raised many questions with regard to the operation of the business of AG, ranging from the effect of a request by President Johnson for American corporations to decrease the value of financing foreign operations from United States sources to the future use of office space by AG. During this same period, the board of administrators met on five separate occasions. At two meetings, the preferred and common stockholders were equally represented. At one meeting, representatives of the preferred shareholders outnumbered the representatives of the common shareholders five to two. At two meetings, representatives of the common shareholders outnumbered representatives of the preferred shareholders four to three. The board, on several occasions, also acted on matters unanimously by virtue of circulated correspondence.

From November 30, 1963, through July 11, 1968, the only classes of stock authorized, issued, and outstanding were 800 shares of common stock and 800 shares of preferred stock. Each class of stock has par value of 1,000 Swiss francs per share. Paid-in capital of the stock of AG was 800,000 ($186,047)[9] Swiss francs for each class of stock.

OPINION

Section 951 [10] provides that a United States shareholder of a

---

[9] During the years in issue, the rate of exchange was approximately 4.3 Swiss francs to one United States dollar.

[10] SEC. 951. AMOUNTS INCLUDED IN GROSS INCOME OF UNITED STATES SHAREHOLDERS.

(a) AMOUNTS INCLUDED.—

(1) IN GENERAL.—If a foreign corporation is a controlled foreign corporation for an uninterrupted period of 30 days or more during any taxable year beginning after December 31, 1962, every person who is a United States shareholder * * * of such corporation and who owns * * * stock in such corporation on the last day, in such year, on which such corporation is a controlled foreign corporation shall include in his gross income, for his taxable year in which or with which such taxable year of the corporation ends—

(A) the sum of—

(i) except as provided in section 963, his pro rata share (determined under paragraph (2)) of the corporation's subpart F income for such year, and

"controlled foreign corporation" must include in its income its pro rata share of the controlled foreign corporation's "subpart F income" regardless of whether that income has been distributed to the shareholder. There is no dispute in this case as to the amount of AG's income or that all such income was subpart F income. Also there is no question that petitioners were United States shareholders within the meaning of section 951(b). Consequently, the only issue for decision is whether AG was a "controlled foreign corporation" during the taxable years in issue within the meaning of section 957(a).

Section 957(a)[11] defines the term "controlled foreign corporation" as any foreign corporation of which more than 50 percent of the total combined voting power of all classes of stock entitled to vote is owned by United States shareholders on any day during the taxable year of such corporation.

Petitioners argue that since legal ownership of more than 50 percent of the total combined voting power of all classes of stock of AG entitled to vote was in the hands of non-United States shareholders, AG is not a controlled foreign corporation within the definition of section 957(a). Respondent contends that by virtue of all surrounding facts and circumstances, petitioners, in effect, retained more than 50 percent of the voting power of AG.

A mere technical compliance with section 957(a) is not sufficient to exclude petitioners from its application. *Hans P. Kraus*, 59 T.C. 681 (1973), affd. 490 F. 2d 898 (2d Cir. 1974); *Garlock, Inc.*, 58 T.C. 423 (1972), affd. 489 F. 2d 197 (2d Cir. 1973), cert. denied 417 U.S. 911 (1974). The 50-percent test of section 957(a) was intended to exclude from the definition of controlled foreign corporation only those foreign corporations which are not subject to the dominion and control of the United States shareholders. *Garlock, Inc., supra* at 433. We must determine whether the substance of the transaction in this case was that

---

(11) his pro rata share (determined under section 955(a)(3)) of the corporation's previously excluded subpart F income withdrawn from investment in less developed countries for such year * * *

[11] SEC. 957. CONTROLLED FOREIGN CORPORATIONS; UNITED STATES PERSONS.

(a) GENERAL RULE.—For purposes of this subpart, the term "controlled foreign corporation" means any foreign corporation of which more than 50 percent of the total combined voting power of all classes of stock entitled to vote is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b), by United States shareholders on any day during the taxable year of such foreign corporation.

which the statute intended, specifically, a meaningful ownership of at least 50 percent of the voting power of AG by non-United States shareholders.

Section 1.957-1(b)(2), Income Tax Regs., provides in part that "Any arrangement to shift formal voting power away from United States shareholders of a foreign corporation will not be given effect if in reality voting power is retained." Section 1.957-1(b)(2) further provides in part that:

The mere ownership of stock entitled to vote does not by itself mean that the shareholder owning such stock has the voting power of such stock for purposes of section 957. For example, if there is any agreement, whether express or implied, that any shareholder will not vote his stock or will vote it only in a specified manner, or that shareholders owning stock having not more than 50 percent of the total combined voting power will exercise voting power normally possessed by a majority of stockholders, then the nominal ownership of the voting power will be disregarded in determining which shareholders actually hold such voting power, and this determination will be made on the basis of such agreement. Moreover, where United States shareholders own shares of one or more classes of stock of a foreign corporation which has another class of stock outstanding, the voting power ostensibly provided such other class of stock will be deemed owned by any person or persons on whose behalf it is exercised or, if not exercised, will be disregarded if the percentage of voting power of such other class of stock is substantially greater than its proportionate share of the corporate earnings, if the facts indicate that the shareholders of such other class of stock do not exercise their voting rights independently or fail to exercise such voting rights, and if a principal purpose of the arrangement is to avoid the classification of such foreign corporation as a controlled foreign corporation under section 957. [12]

After a comprehensive analysis of the evidence in this case we are of the opinion that the petitioners divested themselves of meaningful voting power in AG.

The 6-percent preferred stock of AG was issued without substantial restriction except that transfer was subject to approval by the board of administrators. This restriction, however, appears to be reasonable for several reasons. First, the common stock was also subject to the same restriction. Second, the restriction appears to be reasonable to insure that at least 50 percent of the voting power of AG remained in the hands of non-United States shareholders. Furthermore, the restriction of nontransfer without approval of the board of administrators was merely a

---

[12] On brief petitioners contended that the final sentence of these regulations is invalid. Since the facts of this case indicate that the preferred shareholders exercised their voting rights independently, we need not, at this time, consider their validity.

carryover from the 1958 articles of incorporation. In other words, this restriction appears to be merely an extension of old corporate rules to cover the new issuance of preferred stock. Finally, in this case the transfer of preferred stock by preferred stockholders was approved by the board on the only two occasions when transfers were requested. This is in sharp contrast with the situation in the *Kraus* case in which the preferred stock was subject to several substantial restrictions while the common stock was issued without any restrictions at all.

The board of directors was evenly split between representatives of the common and preferred stockholders during the entire period and there were no provisions for breaking deadlocks. In fact, any provisions to prevent deadlocks were purposely avoided by the parties. We also deem as significant the powers which the representatives of the preferred shareholders possessed under Swiss law. These included: (1) The power to vote on dividends to be declared, which included dividends to the common shareholders; (2) to vote on transfer of registration of common stock; and (3) the power to alter the course of corporate events by use of the "signature power" which could have bound the corporation. Respondent does not contest the presence of these powers but argues that they are irrelevant because in reality the preferred shareholders had no reason to ever use such powers because they possessed only the limited right to a fixed dividend. We recognize that the preferred shareholders had a more limited interest to protect than the common shareholders and that this was one factor in both the *Garlock* and *Kraus* cases. None the less, we are not prepared to state that the preferred shareholders possessing such wide powers were not disposed to use such powers to protect the interest they did have. Neither of the taxpayers in *Kraus* or *Garlock* possessed such wide powers. See also *Estate of Edwin C. Weiskopf,* 64 T.C. 78 (1975). Moreover, the interests of the common shareholders in those cases were buttressed by restrictions on redemption or reacquisition of the preferred stock which inured strictly to the benefit of the common shareholders. In other words, there were significant strings tied to any action which the preferred shareholders would take.

The parties have argued at great length with regard to the question of whether the preferred shareholders actively participated in the corporate affairs of the corporation. This Court in the *Kraus* case specifically relied on the fact that "the evidence

does not indicate any active participation in the management of [the company] by the preferred shareholders." In the *Garlock* case this Court relied on the "manipulation and selection" of the board of directors "as negativing any shift of control from the taxpayers." The evidence in this case shows a continued participation by the representatives of the preferred shareholders in the affairs by virtue of their activities on the board of directors and at the shareholders meetings. As noted by this Court in the *Kraus* case, a highly successful corporation is apt to sell its shares to persons who are indisposed to question corporate policy. The minutes of the corporate shareholders meetings of AG, however, show that the representatives of the preferred shareholders took an active part in considering various questions with regard to the activities of AG. These questions ranged from the use of office space by AG within Switzerland to the question of pressure being applied by President Johnson on United States corporations with regard to investments in foreign countries. What was lacking in *Weiskopf, Kraus,* and *Garlock* cases was any real opportunity to alter the course of events by the preferred shareholders. In this case the preferred shareholders had, by virtue of the powers which they possessed, a real opportunity to alter the course of events of the corporation if they desired to do so. Their participation in the shareholders meeting also showed that the preferred shareholders were interested in protecting the interest which they did possess in the corporation.

Prior to the issuance of the preferred stock in AG old CCA had AG transfer its ownership interest in other foreign manufacturing corporations to a third foreign corporation, CME. Representatives of old CCA testified that this was done in order to insure that the 50-percent voting power given up to the preferred shareholders would not interfere in any way with the activities of these manufacturing corporations. We view this transfer as some indication that petitioners viewed the issuance of the preferred stock as a threat to their unfettered control over AG. After such transfer AG's business activities consisted of licensing technology to CCA subsidiaries, as well as to third parties, and technical service, assistance, and sales activities in Europe and the Middle East.

The overall arrangement also shows that old CCA intended to divest itself of 50 percent of the voting power of AG in order to meet the provisions of the Revenue Act of 1962. This factor,

however, does not "taint" the transfer per se. In *Hans P. Kraus, supra* at 693, this Court stated:

We have no doubt that the effects of being classified as a controlled foreign corporation have caused many U.S. shareholders to divest themselves of enough voting power to avoid section 957(a). There is clearly nothing improper about such a purpose for the divestiture.

Old CCA attempted to so divest itself by issuing preferred stock with 50 percent of the voting power of AG to non-United States shareholders.

The aggregate effect of the factors considered above indicates that old CCA did divest itself of dominion and control of AG. There were no substantial restrictions placed upon the preferred stock that were not also placed upon the common stock. Nor were there any provisions made whereby old CCA would reacquire the stock of the preferred shareholders should they desire to sell the stock. Furthermore, a board of directors that was equally divided between preferred and common shareholders was established and the members of that board were given very significant powers which could have been used by both the common and the preferred shareholders to alter the course of events of the corporation. The preferred stock was sold to nonrelated shareholders whose representatives at the shareholders meetings and the board of directors took an active part in the consideration of AG's business. Old CCA retained no significant strings which could have been used by it to require the preferred shareholders to vote with it regarding questions of AG's business. This is in sharp contrast to the cases in which this Court has found that United States shareholders retained dominion and control over the foreign corporation. See *Estate of Edwin C. Weiskopf, supra; Hans P. Kraus, supra; Garlock, Inc., supra.* We recognize that, as in the *Kraus* case, the amount paid by the preferred shareholders for their stock was less than 50 percent of the net worth of AG. This fact alone, in light of the other factors present in this case, is not sufficient to classify AG as a controlled foreign corporation.

We hold that under the facts and circumstances of this case, old CCA successfully divested itself of 50 percent of the voting power of AG. Therefore, AG is not considered to be a controlled foreign corporation within the provisions of section 957(a).

*Decisions will be entered under Rule 155.*