KOEHRING COMPANY, a Wisconsin Corporation, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 77–2016.

United States Court of Appeals, Seventh Circuit.

Argued March 3, 1978.

Decided Aug. 4, 1978.

Edward C. Rustigan, Chicago, Ill., for plaintiff-appellant.

Anthony Ilardi, Jr., Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before PELL and WOOD, Circuit Judges, and FLAUM, District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

The question presented in this appeal is whether the district court erred in finding

* The Honorable Joel M. Flaum, United States District Judge for the Northern District of Illinois sitting by designation.

that a foreign corporation partially owned by the Koehring Company was a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code. We affirm.

The facts as found by the district court in its unreported opinion are as follows: Koehring Company (taxpayer) is a Wisconsin corporation engaged in the manufacture of heavy construction equipment. In 1959 Koehring acquired a Panamanian corporation which it renamed Koehring Overseas Corporation (KOS). KOS was thereafter operated as a wholly-owned subsidiary responsible for the overseas marketing of Koehring products in the western hemisphere. Under the provisions of the Internal Revenue Code (IRC or Code) prevailing at that time, KOS's profits were not taxed to Koehring until remitted to the parent corporation in the form of a dividend. However, in 1962 Congress debated adding provisions to the IRC which would have taxed the undistributed income of certain controlled foreign corporations. This change was a matter of concern to Koehring officials, who made their views known to members of Congress. Nevertheless, in October of 1962 Congress added the provisions of Subpart F to the Code which would have required Koehring to pay taxes on KOS's undistributed earnings.

In 1963 Koehring entered into an arrangement designed to take KOS out of the ambit of Subpart F by transferring voting control of KOS to Newton Chambers, an English corporation, also engaged in the manufacture of construction machinery. On or about September 3, 1963, Newton Chambers acquired 44,000 shares of newly issued 8% cumulative voting preferred stock with a par value of $10 per share. This represented 55% of the outstanding KOS stock entitled to a vote. Koehring retained 36,000 voting shares of $10 par value common stock, representing the remaining 45% of the voting shares.

At the time of the sale, Newton Chambers and Koehring enjoyed a long standing business relationship, which began shortly after World War II. At that time Koehr-ing gave Newton Chambers a license to manufacture certain equipment designed by Koehring and to market the products in an exclusive territory encompassing much of the eastern hemisphere. In subsequent years Newton Chambers was gradually relieved of portions of its exclusive territory, largely because of its alleged lack of diligence in promoting sales of the Koehring products. This and related problems were the subject of ongoing discussions between the two companies beginning in 1958. Both corporations wanted to improve the international marketing of their products. One of the ideas discussed was the concept of a jointly-owned international marketing subsidiary.

In 1962 Koehring acquired an interest in a French company which it renamed Koehring-Brissonneau. Since Koehring-Brissonneau was engaged in marketing Koehring products in continental Europe, Newton Chambers' chairman, Sir Peter Roberts, protested that the licensing agreement between Koehring and Newton Chambers was being violated and renewed his suggestion of a joint marketing subsidiary. More specifically, his letter suggested that Newton Chambers acquire an equity interest in KOS and that KOS should be the means of coordinating the "international impact of Koehring."

In the spring and summer of 1963, Koehring and Newton Chambers discussed various cross-investment plans. On July 5, 1963, Newton Chambers applied for exchange control approval for the acquisition of the $400,000 worth of KOS preferred stock. Newton Chambers was to acquire the KOS stock on September 1, 1963, but with a right to force redemption of the shares at a premium after June 30, 1968. In December of 1963 Koehring-Waterous, Koehring's Canadian subsidiary, was to invest $400,000 in an issue of 5% redeemable, non-voting preferred stock to be issued by Ransomes & Rapier, Ltd., a Newton Chambers subsidiary. However, in August of 1963, Koehring discovered that under Panamanian law KOS preferred could not be issued at less than par value, which meant

that Newton Chambers would have to invest $440,000 rather than $400,000. At the same time, the amount that Koehring was to invest in Ransomes & Rapier was increased by $40,000. In the end, by February of 1964 Koehring-Waterous had purchased 143,000 shares of Newton Chambers preferred stock for $440,000 (instead of the Ransomes & Rapier preferred) and Koehring itself had purchased 325,000 shares of Ransomes & Rapier common stock for approximately $2,400,000 and 100,000 shares of Ransomes & Rapier preferred for 63,272 pounds. Newton Chambers purchased the 44,000 shares of KOS preferred which the district court found to be subject to an agreement that Newton Chambers would be allowed to withdraw its investment on one year's notice.

In September 1963, a new KOS Board of Directors was constituted; three directors being elected by Newton Chambers and two by Koehring. In January 1964, Sir Peter Roberts became Chairman. The district court found that between October 25, 1963, and November 1967 there were ten board meetings and two stockholders meetings. Of the two stockholders meetings, one was adjourned for lack of a quorum and no Newton Chambers representatives attended the other. Of the ten board meetings, no Newton Chambers directors participated in six, one of which had to be adjourned for lack of a quorum. One of the four directors meetings attended by Newton Chambers directors was that at which Sir Peter Roberts was elected Chairman. At each of the others the primary actions were found by the district court to be of a passive nature more consistent with the theory that KOS was an instrumentality of Koehring than that it was a joint international sales subsidiary actively dominated by Newton Chambers. The court also made the following finding:

> The actions of the Newton-Chambers directors was such as would be expected of sham directors whose real interest lay in protecting the Newton-Chambers stake in

KOS. On April 1, 1965, Sir Peter Roberts urged that KOS keep $440,000 in the bank to protect the preferred shareholder's investment. On September 16, 1966, Sir Peter Roberts acquiesced in surrendering to Koehring-Brissonneau the European territory and former non-British African colony territory. In November 1967, the Newton-Chambers directors successfully opposed declaring a dividend on the common stock.

After Newton Chambers acquired majority control of KOS there were remarkably few changes in KOS operations. Newton Chambers did not attempt to replace existing management, which was closely identified with Koehring, with executives more loyal to Newton Chambers. KOS continued to sell only Koehring products until 1967, when it began selling a few Newton Chambers products on a trial basis at the suggestion of Koehring's president. No Newton Chambers directors were authorized to draw checks on behalf of KOS, even though at least two Koehring directors who were not officers of KOS were so authorized. Moreover, Newton Chambers referred to its control over KOS as being "nominal" in the minutes of the Board of Directors meeting on September 11, 1963 (Exhibit G), and stated that its investment in KOS was "nominal" in its 1963 annual report.[1]

On the basis of the above facts, the Internal Revenue Service claimed that for the tax year ending November 30, 1964, KOS was a "controlled foreign corporation" of Koehring as defined by Section 957 of the Code and that its "Subpart F" income was therefore taxable to Koehring under Section 951 even though not yet distributed as a dividend to Koehring. After exhausting intra-agency appeals procedures, Koehring paid the claimed deficiency and filed a claim for a refund in the amount of $412,-840.47. After the IRS denied the claim, the present action was commenced on July 30, 1971, seeking refund of the taxes paid plus

---

1. The finding with respect to the Board meeting was not made by the district court. The reference in the annual report merely indicated that

the investment was nominal from an accounting point of view for consolidation purposes.

statutory interest. A trial was held in May of 1975 and on June 3, 1977, the district court issued an order dismissing the Koehring suit.[2] Appeal has been taken to this court pursuant to 28 U.S.C. § 1291.

## I.

Subpart F of the IRC was enacted in order to deter United States taxpayers from using related foreign base companies located in tax haven countries to accumulate earnings that could have been accumulated just as easily in the United States. By requiring the United States taxpayer to include in his current taxable income his share of the current foreign base company income of foreign corporations controlled by him, Subpart F removes the tax deferral benefits of such off-shore earnings accumulations. For the purposes of this subpart, Section 957(a) of the Code defines a "controlled foreign corporation" (hereinafter CFC) as "any foreign corporation of which more than 50 percent of the total combined voting power of all classes of stock entitled to vote is owned . . . by United States shareholders . . .." Not surprisingly, the Treasury Regulations relating to Section 957 require that in certain circumstances the nominal distribution of voting power will be ignored when it is not consistent with the reality of control.[3] Of particular relevance to the case at bar are the two parts of Regulation § 1.957–1(b)(2). The first part of that regulation provides:

(2) Shifting of formal voting power. Any arrangement to shift formal voting power away from United States shareholders of a foreign corporation will not be given effect if in reality voting power is retained. The mere ownership of stock entitled to vote does not by itself mean that the shareholder owning such stock has the voting power to such stock for purposes of section 957. For example, if

there is any agreement, whether express or implied, that any shareholder will not vote his stock or will vote it only in a specified manner, or that shareholders owning stock having not more than 50 percent of the total combined voting power will exercise voting power normally possessed by a majority of stockholders, then the nominal ownership of the voting power will be disregarded in determining which shareholders actually hold such voting power, and this determination will be made on the basis of such agreement.

Here, the IRS argues that the nominal control of KOS was transferred by Koehring to Newton Chambers pursuant to an implied agreement which effectively permitted Koehring to continue to exercise operating control over its marketing subsidiary. The second part of Regulation 1.957–1(b)(2) sets forth the "tri-test" which is to be applied where there are separate classes of voting stock:

[W]here United States shareholders own shares of one or more classes of stock of a foreign corporation which has another class of stock outstanding, the voting power ostensibly provided such other class of stock will be deemed owned by any person or persons on whose behalf it is exercised or, if not exercised, will be disregarded [1] *if the percentage of voting power of such other class of stock is substantially greater than its proportionate share of the corporate earnings,* [2] *if the facts indicate that the shareholders of such other class of stock do not exercise their voting rights independently or fail to exercise such voting rights, and* [3] *if a principal purpose of the arrangement is to avoid the classification of such foreign corporation as a controlled foreign corporation under section 957.* (Emphasis added.)

---

**2.** On July 28, 1977, this order was amended to reduce Koehring's Subpart F income by $489,-008 pursuant to a stipulation between the parties that if KOS were found to be a "controlled foreign corporation," it would qualify as an "export trade corporation" as defined by Section 971 of the IRC.

**3.** Section 957 itself mandates a look behind the facade of nominal voting power by application of the Section 958 attribution of ownership rules.

The IRS also argues that the facts of the present case come within the tri-test and that Newton Chambers' nominal voting control should therefore be disregarded.

On appeal, Koehring does not challenge the validity of the above regulations,[4] but rather their applicability to the facts of this case. They argue that there was no agreement that Newton Chambers would abstain from exercising its power to control the operations of KOS, but that, quite to the contrary, it was made clear to Koehring at the time that the stock purchase was being negotiated that Newton Chambers would exercise its majority power in its own interests should there be a conflict. They also argue that the tri-test is not applicable. It is not strongly urged that the arrangement with Newton Chambers did not have as a principal purpose the avoidance of KOS being classified as a CFC.[5] Nor is there a substantial challenge to the district court's conclusion that Newton Chambers' ownership of the separate class of stock carried with it a percentage voting power that was substantially greater than its proportionate share of KOS's earnings.[6] However, Koehring does forcefully disagree with the district court on the question of whether Newton Chambers exercised its voting rights independently within the meaning of the second branch of the tri-test.

## II.

◼ Koehring has graphically demonstrated that the voting preferred issued to Newton Chambers here was subject to fewer formal restrictions than the stock issued to the foreign shareholders in other cases in which a transfer of control has been found to be illusory. See *Garlock, Inc. v. Commissioner*, 489 F.2d 197 (2d Cir. 1973), aff'g 58 T.C. 423, cert. denied, 417 U.S. 911, 94 S.Ct. 2608, 41 L.Ed.2d 215 (1974); *Kraus v. Commissioner*, 490 F.2d 898 (2d Cir. 1974), aff'g 59 T.C. 681 (1973); *Estate of Weiskopf*, 64 T.C. 79 (1975), aff'd, 76–1 U.S.T.C. ¶ 9387 (2d Cir. 1976). The formal restrictions found in those cases included restrictions on the transferability of the shares, call provisions, provisions giving the stockholders the right to force redemption of their shares, etc. In addition, in each of those cases there was a 50–50 division of voting rights between the U.S. shareholders and foreign shareholders. In the present case, Newton Chambers acquired shares representing 55% of the total voting shares, and there was an absence of formal restrictions on transfer, call features, or charter provisions permitting Newton Chambers to force redemption of its shares.[7] Formal restrictions on the transferability of the stock issued to the foreign shareholders might be useful to the U.S. shareholder where the foreign shareholder has been chosen because of his lack of interest in exercising its voting power. In such a case, the restrictions on transfer could prevent the shares from falling into unfriendly hands. Formal provisions giving the foreign shareholders a "put" on their stock would make it more attractive for them to invest money in a corporation which they realize will be controlled in fact by the U.S. shareholder, by giving them an enforceable means of withdrawing their investment without loss. A provision giving the corporation the right to call the shares issued to the foreign shareholders would

---

4. The Regulation has been upheld in other cases. See, *e.g. Garlock, Inc. v. Commissioner*, 489 F.2d 197, 210 (2d Cir. 1973).

5. Koehring's concern with the tax consequences of Subpart F was manifest even before that section was enacted. Moreover, the record is replete with evidence which demonstrates that, even if there were some business reasons for Newton Chambers to make an investment in KOS, the transaction was timed and structured the way that it was largely because of Koehring's desire to avoid the tax consequences of Subpart F.

6. The issue of preferred stock gave Newton Chambers 55% of the total voting rights, yet less than 10% of the average annual earnings.

7. The district court found that Newton Chambers had the right to withdraw with one year's notice—a finding that Koehring attacks as clearly erroneous. We do not interpret the district court's finding to be that there was a formal right to force redemption attached to the preferred shares, but rather that the right to withdraw was part of the "understanding" between Koehring and Newton Chambers.

allow the U.S. shareholder to protect its control by forcing out the foreign shareholders if they should try to take their nominal voting rights seriously. A 50–50 split of the voting rights combined with other formal features or circumstances giving the U.S. shareholder a modicum of additional leverage can insure that the latter will retain effective control even if the foreign shareholders were to try to exercise their full voting power. Thus, the presence of one or more of these features tends to support a finding that the U.S. shareholder has arranged things in such a way that he has not actually divested himself of effective control. This does not mean that an absence of such formal restrictions militates against a finding that an apparent transfer of a majority of the voting rights merely hides an elaborate and subtle arrangement for retaining operational control. In the present case, this purpose was allegedly accomplished by an informal side agreement between Newton Chambers and Koehring rather than by more visible tinkering with the nature of the legal rights formally transferred to the English company.

## III.

Koehring's version of Newton Chambers' investment in KOS might be paraphrased as follows. Koehring and Newton Chambers have had a long-standing, cooperative relationship in the production and marketing of heavy construction equipment, with the primary component being Newton Chambers' license to manufacture and market Koehring-designed equipment in large areas of the globe. Desiring even further integration of the interests of the two companies, it was decided that Newton Chambers would take a controlling equity position in KOS as a first step in turning KOS into a joint-marketing subsidiary for the products of both companies. This was done by issuance of KOS preferred to Newton Chambers, which then used its voting power to elect a majority of the board of directors. Newton Chambers proceeded to use this majority to protect its interests as a preferred shareholder and to promote the transformation of KOS into a joint-sales subsidiary selling both Koehring and Newton Chambers products. Independently, Koehring made an equity investment in the Newton Chambers group in order to more closely link the interests of the two companies in the eastern hemisphere.

The IRS sees the situation differently. After the passage of Subpart F, Koehring was anxious to find some means of shielding KOS's profits from the taxman, but without losing operating control of its subsidiary. It was decided to transfer nominal control to Newton Chambers, a company that Koehring could trust and which was sympathetic to Koehring's tax plight. Because of the long-standing working relationship between the two companies and Newton Chambers' continuing dependence on Koehring under the license agreement, Newton Chambers would have little incentive to try to use its nominal control over KOS to make operating changes against Koehring's wishes. Because Newton Chambers was short of cash, an arrangement was made for a cross-investment by Koehring in the Newton Chambers group of companies, thus giving Newton Chambers nominal control of KOS for a zero net investment. In order to compensate Newton Chambers for the risks and inconveniences of taking nominal control of KOS, the dividend rates on the two issues of preferred involved in the cross-investments were adjusted so as to give Newton Chambers a net gain. Both investors were also given the right to withdraw should the need arise. Although there was no formal redemption feature on the KOS stock, there was an informal understanding to this effect. After the transfer of nominal control, the Newton Chambers directors would occasionally appear to participate in the running of KOS, but effective operational control remained in Koehring's hands. An occasional action was taken to protect Newton Chambers' minimal financial interest in KOS, such as the setting up of a cash reserve for the redemption of Newton Chambers' preferred stock, but this was apparently a part of the original agreement between Koehring and Newton Chambers. Thus, what might have

otherwise been construed as evidence of Newton Chambers' independent use of its control position to protect its own limited interests was actually part of the pre-arranged consideration for its willingness to help Koehring out with its tax problem.

The district court appears to have accepted the second version of events and we cannot say that the record is inconsistent with its findings. We also agree that the nature of the agreement between Koehring and Newton Chambers was such that Newton Chambers' nominal control of KOS should be disregarded for the tax year in question. By retaining operational control coupled with a 100% interest in the earnings of KOS after allowance for the limited preferred dividend, Koehring continued to enjoy the tax deferral benefits of off-shore earnings accumulation of the type that Subpart F was intended to eliminate. In reaching this result, we find the suggestions of error advanced by Koehring to be unconvincing.

Koehring first contends that the district court's finding that Newton Chambers' KOS investment was conditioned on a cross-investment by Koehring is clearly erroneous. They point out that the Koehring-Waterous investment in Newton Chambers did not occur until six months after Newton Chambers acquired the KOS preferred stock. We agree that there is nothing in the record which indicates that Koehring was legally bound to make a subsequent investment in the Newton Chambers group, but the facts give rise to a strong inference that there was an understanding that Koehring-Waterous would make such an investment in order to provide Newton Chambers with the funds for its investment in KOS. The two investments were planned for exactly the same amount of money and when a local law snag required that Newton Chambers' investment in KOS be increased by $40,000, Koehring-Waterous' investment was increased by the same amount. Moreover, in Newton Chambers' application to the U.K. exchange control authorities, the two investments were described as being linked. The fact that the KOS transaction was rushed to closing six months before the Koehring-Waterous deal may have been the result of the fact that Koehring's fiscal year was about to end. Moreover, the IRS points to evidence that in fact the lion's share of Koehring-Waterous' investment in Newton Chambers was deposited in the latter's Canadian account at the time the KOS deal was closed.

It does not appear that Koehring's acquisition of 40% of Ransomes & Rapier for $2,400,000 was as closely linked with the KOS transaction as was the Koehring-Waterous investment. The larger investment appears to have been the subject of independent attention, and at one point came close to not materializing. It is thus not entirely clear that this investment was a *quid pro quo* for the KOS transaction in the sense that the latter was a necessary and sufficient cause of the former, rather than the result of more complex business reasons. It might be more accurate to suggest that these transactions were related in that they represented two strands of an expanding web interlacing the business interests of the two companies. However, having agreed with the district court's finding that the Koehring-Waterous transaction was a *quid pro quo* for the Newton Chambers Investment in KOS, we do not believe that our inability to similarly characterize the acquisition of the 40% of Ransomes & Rapier seriously undermines the district court's overall characterization of the KOS transaction. In any event, the existence of the larger investment made it less likely that Newton Chambers would exercise its control of KOS antagonistically to Koehring's interests.

Koehring itself suggests that whether or not the Newton Chambers investment in KOS was conditioned on a cross-investment in the Newton Chambers group is irrelevant with regard to the question of whether there was an agreement that Newton Chambers would not independently exercise its control over KOS. We cannot fully agree. Although there may be instances when there are clear business reasons for cross-investments between two

companies, when the circumstances suggest that one investment is being undertaken to provide the investee with the funds for the reciprocal transaction, there is support for the view that the second transaction is not really being undertaken in order to gain operating control. This appears to be consistent with the view of the relationship between capital and control held by the parties. In a letter dated December 4, 1963 (Exhibit No. 84), Julian Steelman, the President of Koehring, wrote the Chairman of Newton Chambers as follows:

We completely agree with your premise that Koehring must put money into Ransomes if they're to have any say in management. *An individual, or a company, have concern in about direct proportion to their investment—that's basic.* (Emphasis added.)

Accordingly, by indirectly putting up the money for Newton Chambers' investment in KOS, Koehring lessened Newton Chambers' stake in KOS and its motivation for exercising independent control.

■ A second finding of fact that Koehring contends is clearly erroneous is the district court's finding that Newton Chambers had the right to withdraw its investment in KOS after one year's notice. We agree that there is nothing in the record suggesting that there was a formal charter provision giving the preferred shareholders the right to force redemption of their stock. The district court's conclusion makes more sense as a finding that as a part of the informal agreement between Koehring and Newton Chambers, the latter would be allowed to back out of its investment in KOS should the need arise. An internal Newton Chambers document of unknown authorship (Exhibit H) analyzing the desirability of an investment in KOS suggested that Newton Chambers reserve such a right. The application to the U.K. exchange control authorities stated that the stock would be redeemable at a premium. The existence of such a right helps explain Newton Chambers' interest in having KOS set aside a cash reserve for the redemption of its stock. It is also noteworthy that the Newton Chambers preferred acquired by Koehring-Waterous

in the other half of the KOS transaction was redeemable. The fact that KOS redeemed Newton Chambers' preferred shares in 1972 at the request of Koehring also suggests that there may have been an understanding that either party would have the right to undo the KOS transaction if needed. In short, we cannot say that the district court's finding was clearly erroneous.

■ Koehring also makes a multi-pronged attack on the district court's finding that Newton Chambers failed to independently exercise control over KOS It is pointed out that Newton Chambers used its majority voting power at a number of stockholders meetings to do what majority stockholders normally do—i. e., elect a majority of the Board of Directors. It is suggested that the inquiry should end there and that there is no reason to examine whether these directors proceeded to exert independent control at the director level in furtherance of the interests of Newton Chambers. We do not believe that the investigation need be so limited. In *Garlock* and *Kraus* the courts relied in part on the failure of the foreign shareholders to use their representatives on the Board to try to influence corporate policies. The tax court in *CCA, Inc. v. Commissioner,* 64 T.C. 137 (1975), seemed somewhat more reluctant to examine the actual actions of the representatives of the foreign shareholders where they had "by virtue of the powers which they possessed, a real opportunity to alter the course of events of the corporation if they desired to do so." 64 T.C. at 152. Yet if the foreign shareholders use their voting power to elect directors who are their representatives in name only because of an implied agreement that they will permit the U.S. shareholders to determine operating policy, it can hardly be said that the foreign shareholders are voting their shares independently. Where, as here, there are other factors suggesting the existence of such an agreement, it is only reasonable that the actual actions of the directors elected by the foreign shareholder be examined to see whether they are consistent or inconsistent with the existence of such an agreement.

Koehring quibbles with the district court's counting and characterization of the shareholder and directors meetings. We agree with taxpayer that the record with regard to Newton Chambers' participation in the shareholder meetings—primarily consisting of the election of a majority of the Board of Directors—does not in itself present strong evidence of an agreement to permit Koehring to retain control. The one exception was the October 25, 1965, shareholders meeting where Newton Chambers gave a proxy to vote its shares to Mr. F. C. Chambers (not associated with Newton Chambers), a Koehring nominee. This is scarcely a means of assuring that its shares would be voted independently. However, the record of Newton Chambers' participation in the directors meetings is a somewhat different story. Of the 13 such meetings held between September 30, 1963 and November 1967,[8] six were held by unanimous consent.[9] Of the remainder, Newton Chambers failed to arrange for the presence of enough of its representatives to assure majority control in five.[10] In light of this record we cannot say that it was clearly erroneous for the district court to conclude that had Newton Chambers really been interested in dominating the affairs of KOS, the pattern of the participation of its representatives in the directors meetings would have been different.

Even stronger evidence of an implied agreement to leave operational control of KOS in Koehring's hands can be found in the actual actions and omissions of the Newton Chambers directors at the Board of Directors level. Although at the time of the "transfer of control," KOS was staffed entirely by employees closely identified with Koehring, Newton Chambers made no personnel changes. Although certain non-officer Koehring directors were given the power to draft checks for KOS, none of the Newton Chambers directors were given this power. Nor is there any record of a significant effort being made to restructure KOS into a joint international sales subsidiary, although that was Newton Chambers' avowed aim in taking control of KOS. KOS continued to market only Koehring-produced equipment until 1967, when at the suggestion of Koehring's president a small number of products produced by Newton Chambers were marketed on a trial basis. Moreover, at the September 16, 1966, directors meeting the Newton Chambers directors acquiesced in the transfer of a portion of the KOS sales territory to Koehring-Brissonneau, in spite of Newton Chambers' previous consternation with the expansion of Koehring-Brissonneau in Newton Chambers' backyard. The district court was clearly reasonable in concluding that this is hardly the record of a determined effort to turn KOS into an active joint-sales subsidiary during the years in question, although it is quite possible that such was the eventual goal of Koehring and Newton Chambers. This assessment is also in agreement with the following report given to the Newton Chambers board on September 9, 1963 (Exhibit G):

> The Company would gain *nominal control* of Koehring Overseas Corporation of Panama, an export company formed to sell Koehring products overseas, by nominating three Directors on that Company's

---

8. Here, we use Koehring's count of the total number of directors meetings. The district court counted ten such meetings between October 25, 1963 through November 1967. The difference between the two counts appears to be due to Koehring's use of a longer time and its decision to count multiple sittings on the same day as separate meetings. The exact number is not crucial to the analysis.

9. Koehring suggests that no inference can be drawn from the fact that these meetings took place by means of the unanimous consent device. While this is formally true, when the unanimous consent mechanism is used primari-

ly to "rubber stamp" proposals originated by Koehring concerning modifications of the profit sharing and retirement plans jointly run by Koehring and KOS, such meetings can scarcely be cited as prime examples of Newton Chambers' use of its majority voting power to dominate the affairs of KOS.

10. These five consisted of the two meetings at which it is conceded that the Newton Chambers directors were outnumbered by the Koehring representatives and the three meetings where the two were equal in number.

Board. This association would, in all probability, lead to the formation of an International Company comprising all Companies with whom Koehring were [sic] associated throughout the world. (Emphasis added.)

Lastly, Koehring argues that the district court made certain findings of fact with regard to the actions of the Newton Chambers directors which negate any finding that Newton Chambers failed to independently exercise its voting rights. The first of such findings is the district court's statement that the Newton Chambers directors caused the creation of a cash reserve for the redemption of the preferred stock. This is an action which was concededly more in Newton Chambers' interest than in Koehring's. In fact, absent other evidence of an informal agreement to leave operating control in the U.S. shareholders' hands, such an action might constitute substantial evidence that the foreign shareholders are voting their shares independently within the meaning of the second branch of the tri-test. See *CCA, Inc., supra.* However, in the present case the evidence suggests that an action such as this was contemplated by the agreement between Koehring and Newton Chambers. It is understandable that in the process of enticing Newton Chambers into taking an equity position in KOS an understanding would arise that certain provisions would be made for the protection of the latter's limited investment. A number of protections were written into the KOS charter, including provisions depriving the common shares of their votes should a certain number of preferred dividends be passed, or should the net asset of KOS fall below a certain value. An additional protection was Newton Chambers' "right" to bring about a redemption of its stock, discussed above. In order to make this protection an effective one, Koehring apparently agreed that KOS would maintain sufficient funds to redeem the preferred stock, or at least that Newton Chambers would be allowed to use its voting power to see that such a result was achieved. That this was a part of the pre-arrangement between Koehring and New-

ton Chambers is suggested by the fact that even before Newton Chambers elected a majority of the KOS directors, Koehring had Koehring-Waterous modify a note representing a loan to KOS to make further payments of principal by KOS subject to the consent of the preferred shareholders (Exhibit No. 39). This offered further protection to Newton Chambers with respect to KOS's cash position. Thus, what might otherwise have been seen as an assertion of its majority control by Newton Chambers contrary to the interests of Koehring must here be seen more as a part of the agreed consideration granted Newton Chambers for its willingness to participate in the arrangement to prevent KOS from being classified as a CFC.

The second, and more troubling, finding of fact pointed out by Koehring is the district court's observation that the Newton Chambers directors twice successfully opposed the declaration of a dividend on the common stock. A finding that the U.S. taxpayer was unable to force the declaration of a dividend on its stock in spite of the full exertion of its effective power during a tax year for which the IRS sought to impose Subpart F taxability would raise a substantial question as to the applicability of Subpart F. Koehring has pointed to certain portions of the legislative history of Subpart F which suggest that Congress was concerned with the fairness and constitutionality of taxing U.S. shareholders who are not able to bring about a distribution of the earnings of the foreign corporation in order to pay the tax. However, that problem is not squarely presented by this case. Here, the two instances in which a Koehring director's proposal for the declaration of a dividend on the common stock never made it to a vote, after Sir Peter Roberts spoke out against the idea, occurred approximately two and three years after the close of the tax year which is the subject of this suit. Moreover, it is difficult to believe that Koehring would have desired the distribution of KOS's earnings during the tax year here in question. In the prospectus accompanying the issuance of the preferred stock

to Newton Chambers, the dividend policy of KOS was declared to be that KOS had never paid a cash dividend on its common stock and that "in the foreseeable future . . . it is contemplated that there will be no dividends paid on . . . [that] stock for the next several years." If a dividend had been declared, the tax deferral which the taxpayer seems to have sought so assiduously to preserve would have been sacrificed. At the time of Newton Chambers' apparent opposition to the declaration of a dividend two years later, Koehring concedes that KOS was not in a good cash position for making such a payment, and in fact had to borrow $1,000,000 to maintain its working capital. Koehring has not pointed to any circumstances which suggest that it was in such a great need of the funds itself that it would have found it necessary to deprive its subsidiary of needed working capital.[11] In any case, we do not believe that the district court's finding leads to the conclusion that Koehring was without power to cause a dividend to be declared on the KOS common stock during the tax year before this court, and therefore need not decide whether the classification of KOS as a CFC for that tax year would have been precluded on such a basis.[12]

We cannot agree with Koehring's argument that a finding that KOS was CFC in this case is inconsistent with the decision in *CCA, Inc. v. Commissioner*, 64 T.C. 137 (1975). Although the record of the foreign shareholders' exercise of their voting power was hardly stronger there than in this case, in *CCA, Inc.* the tax court found an absence of any agreement between the U.S. and foreign shareholders regarding the voting of the latter's shares. Although it might be argued that it is incongruous to tax a U.S. shareholder who gives away nominal control of a foreign subsidiary but who retains operating control under an implied agreement, while a second taxpayer who gives away nominal control but who retains practical control because of the dispersal of the ownership of the foreign-held stock or other nonconsensual circumstances escapes taxation, the existence of an agreement brings the former situation more forcefully within traditional sham doctrine principles with regard to the transfer of control.[13] *See, e. g., Higgins v. Smith*, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1970).

The kind of implied agreement that the IRS suggests existed in this case is somewhat amorphous and flexible. There is much evidence in the record that suggests that Koehring and Newton Chambers were honestly considering ways in which their interests might be further enmeshed, including the possibility of a joint sales subsidiary. It may even be the case that for tax years subsequent to those under consideration here a real effort was made to turn KOS into such an entity.[14] If KOS were to begin to market Newton Chambers products in significant quantities, Newton Chambers would have much more important interests to protect by exertion of its nominal control position than those stem-

11. It is also possible that Koehring actually desired a dividend at this point, but that because of the understanding with Newton Chambers that the latter's concerns for the protection of its investment would be respected. Once Sir Peter Roberts opposed the idea of a dividend the Koehring directors obligingly declined to pursue the proposal any further.

12. We concede that our analysis of this issue, as well as that of a number of other issues, has involved a greater degree of "looking behind" the district court's findings of fact than is customary under the clearly erroneous standard of review. However, we note that Koehring has expressly invited this court to undertake such a thorough review of the record (Opening Brief, pp. 35–36) and that because the record itself is predominantly documentary, the admonition of Rule 52 of the Federal Rules of Civil Procedure rings out less forcefully. In any event, we do not believe that the factual analysis that we have undertaken in this opinion is materially inconsistent with the trial court's findings.

13. We do not mean to imply that we would necessarily agree with the tax court's analysis in *CCA, Inc.* if a similar situation were presented to us.

14. In fact, the minutes of the 1966 and 1967 directors meetings suggest an increasingly active participation by Sir Peter Roberts in the policy-making deliberations of the Board.

ming from its ownership of the KOS preferred. In short, at some point it is possible that the operations of KOS would in fact have taken on the mantle of the kind of partnership allegedly envisaged by the parties. However, the record here suggests that, at the very least, the timing of Newton Chambers' investment in KOS was dictated by Koehring's Subpart F concerns and that the transaction was structured accordingly. Whatever may have been the long run potential for treating KOS as a joint venture, there is strong evidence here that there was no intention of divesting Koehring of operating control in the short run.

The judgment of the district court is Affirmed.